Frank W. HAM, d/b/a Century 21 Ham
Realty, Appellant,

v.

Ivor and Judy MORRIS, Respondents.

No. 67703.

Supreme Court of Missouri,
En Banc.

June 17, 1986.

Terence C. Porter, Columbia, for appellant.

Laurence M. Woods, Columbia, for respondents.

WELLIVER, Judge.

This case involves an appeal from a circuit court judgment awarding appellant, Frank Ham,[1] $3,500 for the reasonable value of his services rendered to respondents. Respondents, Ivor and Judy Morris, sold their restaurant the Haden House, located

1. Frank Ham, d/b/a Century 21 Ham Realty.

in Columbia, Missouri, to a newly formed corporation of which Jack Crouch and Bill Bratrud were equal shareholders. The property sold for $550,000, and on appeal appellant claims that on the theory of *quantum meruit* the reasonable value of his services rendered is the usual and customary 6% real estate commission on the sale, which amounts to $33,000. Appellant prevailed in the Court of Appeals, Western District. We transferred and now decide the case as on original appeal. Mo. Const art. V, § 10. We affirm.

The case was tried before a judge sitting without a jury, and the court entered findings of fact and conclusions of law. Appellant argues on appeal that the court's judgment is contrary to the weight of the evidence, claiming that there is no evidence of the reasonable value of his services other than his testimony that the reasonable value of the services is the usual and customary 6% real estate commission, and that he is entitled to all or nothing. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) sets forth our scope of review.

At the outset, we note that this case presents all of the usual evidentiary disputes found in real estate commission cases. This matter is further complicated by the negotiations and events occurring intermittently over a period of time among parties who had all known or dealt with each other prior to the sale of the restaurant.

Sometime early in 1981, respondent Ivor Morris told various individuals, including real estate brokers, that he might be interested in selling his restaurant known as the Haden House. Respondent also talked to Bill Bratrud, a frequent customer of the restaurant, about the possibility of selling his business. Bratrud suggested to Morris that Jack Crouch might be interested in the business. Crouch had been a resident of Columbia and a former restaurant operator, but in 1981 was living in Palm Springs, California. Crouch's daughter lived in Columbia, and there was some indication that Crouch might return to Missouri. Bratrud had called Crouch to determine whether

Crouch would be interested in returning to Columbia and buying a local business, and the Haden House was one of the businesses discussed.

During the latter part of March 1981, Crouch visited his daughter in Columbia. Appellant Frank Ham met with Crouch during this visit and discussed the possibility of Crouch relocating in Columbia and buying a restaurant. Ham and Crouch knew one another, and Ham had assisted Crouch in a prior real estate transaction. Ham informed Crouch that the Haden House might be up for sale.

In May, 1981, Ham and Morris were sitting at a bar in Columbia and Morris remarked "Why don't you sell that restaurant for me?" No further discussion ensued on the subject. On July 29, 1981, Ham telephoned Crouch in California on another matter, and during the conversation again mentioned that Crouch should consider buying the Haden House. Crouch returned to Columbia during the late summer, and once again Ham talked with Crouch about the possibility of purchasing Morris's restaurant.

On August 20, 1981, Ham visited Morris at the restaurant. Ham had prepared a real estate sales agency (listing) agreement, which provided for a 6% commission. The two parties proceeded to discuss selling the Haden House. Although Ham and Morris dispute the substance of the discussion, the trial court found that Morris refused to sign the agreement, but Morris said that, if Ham could net $595,000 on the sale, Morris would pay his commission. Morris also asked Ham if Crouch was the intended buyer, and, after hesitation, Ham said yes.

Morris at one time gave Ham some profit and loss statements, which Ham then relayed to Crouch. At this time, however, Crouch was not seriously interested in the Haden House. Instead, Crouch and Bratrud were working on entering into a partnership and purchasing another piece of property, the All States Motel, and converting the old house on the premises into a restaurant. These negotiations began dur-

ing the latter part of 1981, and the purchase was closed during the first week in January 1982.

After the purchase and following the preparation of some plans, Bratrud and Crouch determined that it might not be feasible, particularly due to the interest rates, to convert their property into a restaurant. Bratrud had been in contact with Morris about the Haden House, and he had obtained profit and loss information from Morris. While there had been a lull in the discussions between Crouch and Ham, Ham had been furnishing Crouch with profit and loss statements. And, early in March, Crouch and Morris talked about the price of the restaurant, with Crouch suggesting $500,000.00 and Morris responding with $575,000.00.

Shortly thereafter, around the 9th of March, Ham called Crouch with additional financial information on the restaurant. The two talked at some length, with a follow-up conversation after Ham received additional information to answer some of Crouch's questions.

Early in May, 1982, Morris traveled to the Mayo Clinic in Rochester, Minnesota, for medical problems that, according to Morris, necessitated that he sell his restaurant. Bratrud went with Morris on this trip, the two parties driving in Bratrud's sports car with the top down. Bratrud had relatives in Rochester whom he could visit. They occupied the same motel room. The two parties discussed the Haden House "[a]bout every night at dinner," according to Morris. Some of these discussions Morris even referred to as "arguments." Morris stated that the trip solidified in his mind that he had to sell the restaurant and that Bratrud was a willing buyer. Bratrud indicated that the trip probably had something to do with the lowering of the price and helped bring the two parties together.

Throughout this period, it should be noted that Ham had almost no contact with Bratrud; even though Bratrud and Crouch were equal partners in buying the Haden House.

During conversations between Ham and Morris, it became apparent that Morris would not be able to net $595,000. Morris, on a couple of different occasions, indicated to Ham that he would be willing to pay Ham something for his services. Morris suggested at one point $2,000 and at another point $5,000 which he said he would pay out of his pocket. Ham testified that, rather than respond to these suggestions, he ignored the statements. Ham started carrying around a tape recorder, well aware of the possibility that a dispute might arise over the commission.

The court of appeals properly noted that Ham continued to talk with both Morris and Crouch about the sale. On May 19th and May 20th, 1982, Ham had lengthy discussions with each of the parties. There was discussion regarding financing possibilities. In June, Morris and Bratrud and Crouch reached an agreement and signed a contract on the 22nd. Ham was not in on the final agreement. He offered to prepare a contract, but Morris said that a contract was being drawn by an attorney. The sale was closed on July 1st. Ham was not invited to the closing and did not attend, although he offered his cooperation to both parties.

The law is well-settled that the right of a broker to recover a commission depends upon the specific terms of the broker's contract. *See Boyd v. Margolin,* 421 S.W.2d 761, 767 (Mo.1967); *Adams v. Kerr,* 655 S.W.2d 49, 52 (Mo.App.1983); *Perkinson v. Burford,* 623 S.W.2d 30, 34 (Mo.App.1981); *E.A. Strout Realty Agency, Inc. v. McKelvy,* 424 S.W.2d 98, 101 (Mo.App.1968); *Rayfield v. Randford,* 404 S.W.2d 423, 425 (Mo.App.1966). *See generally* D. Burke, Law of Real Estate Brokers §§ 2.1, 2.3, 2.10 (1982). Although not generally favored by real estate brokers, there is a *net listing* contract "where [t]he broker takes his commission exclusively from the purchase price received over the vendor's specific price," the broker getting only the difference between the specified price and sale price, or getting nothing if the property is sold at the specified price or

less. D. Burke, *supra*, at § 2.2.4. Similarly, if the listing agreement provides that the broker must procure a ready, willing and able buyer within six months, and there is no *extension clause*, the broker is not entitled to a commission if a buyer procured by the broker is not ready, willing and able within that six months and the vendor has acted in good faith.[2] D. Burke, *supra*, at §§ 2.3.1, 2.11. The terms of and compliance with the listing agreement—whether oral or written, express or implied—are questions of fact for the trial court to decide.

■ Not only must there be compliance with a listing agreement, the broker must also prove the necessary causal connection between the sale and the broker's efforts. "A broker is not entitled to recover a commission when his efforts merely produced one event in a chain of actions which contributed to a sale of the listed real property. His efforts must be *the primary, predominant, efficient, or procuring cause* of the transaction or transfer." D. Burke, *supra*, at § 3.4 (emphasis added). *E.g., Zabol v. Lasky*, 555 S.W.2d 299, 304 (Mo. banc 1977); *E.A. Strout Realty Agency, Inc. v. McKelvy, supra*, at 101–04. In *Kohn v. Cohn*, 567 S.W.2d 441 (Mo.App.1979), the court stated this general rule:

> The broker has the burden to prove that an employment relationship existed between the owner and himself and that he was the efficient or procuring cause of the sale. If both the contract and the causation are established, the broker is entitled to reasonable compensation for his services. *Smith v. Piper*, 423 S.W.2d 22 (Mo.App.1967); *Ballentine v. Mercer*, 130 Mo.App. 605, 109 S.W.2d 1037 (1908). In the absence of a contract of employment between the broker and the owner, the owner is not obligated to pay a commission even if the broker was the efficient cause of a sale which is later con-
> summated. *Windsor v. International Life Ins. Co.*, 325 Mo. 772, 29 S.W.2d 1112 (1930); *Longmire v. Diagraph-Bradley Stencil Mach. Corp*, 176 S.W.2d 635 (Mo.App.1944); *Ballentine v. Mercer*, supra. See also Restatement (2d) of Agency § 442, comment (a). A broker who is a mere volunteer is entitled to no compensation for services gratuitously rendered. A contract of employment is the essential element for recovery. *Hoover v. Whisner*, 373 S.W.2d 176 (Mo.App. 1963).

*Kohn v. Cohn, supra*, at 446 (footnote omitted).

■ In the case at bar, the trial court entered its finding of fact that the only agreement between the two parties was an oral agreement on the part of respondent Morris to "pay as commission to [appellant] any amount of sale proceeds over and above $595,000.00." The court also found that appellant failed to establish any bad faith on the part of respondent in accepting a price below $595,000.00, and that appellant was only "one of the procuring causes" of the purchase and not entitled to recover under the oral listing agreement. These findings are supported by the record, and under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), we accept them because they are not against the weight of the evidence.

In his brief, however, appellant does not claim any entitlement to a commission under the oral agreement. Rather, appellant argues that he is entitled to sue for the reasonable value of his services under *quantum meruit*, regardless of the terms of any listing agreement and whether he was the *procuring cause* of the purchase. Considerable controversy and confusion surrounds when, or whether, a broker can elect to disregard the terms of an oral listing agreement and sue for *quantum meruit*.[3] It may well be that this confu-

---

**2.** It might be noted that the agency contract prepared by Ham contained a six month clause without an extension agreement.

**3.** *See generally* D. Burke, *supra*, at § 3.4, no. 24 (1985 Supp.); G. Palmer, 2 The Law of Restitution § 6.9 (1978). *E.g., Marta v. Nepa*, 385 A.2d 727 (Del.Super.Ct.1978) (quantum meruit, measured not by the standard commission but the

sion stems from the difference between *quantum meruit* as a remedy under an implied contract theory and imposing an obligation under the theory of unjust enrichment.[4] It would seem that the better view is to limit the availability of *quantum meruit* in real estate commission cases; otherwise, vendors might be subject to multiple suits by various brokers, one of which could claim either that he or she was the efficient procuring cause of the sale and entitled to a full 6% commission and one or more who might claim to be *one* of the procuring causes of the purchase and entitled to the reasonable value of his or her services. However, we need not reach these issues because respondents have not appealed from the judgment awarding appellant $3,500 for his services on the theory of *quantum meruit*.

■ Under the facts of this case, we will not disturb this judgment of the trial court. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Both a net listing contract and the usual and customary real estate contract for a 6% commission by their very nature and their terms are not related to either the time spent in performing the contract or the reasonable value of the time spent. There was evidence that appellant considered the reasonable value of his service to be 6% of the sale price and that respondent had told appellant that he thought his service reasonably might be worth from $2,000 to $5,000. While appel-

lant ignored these statements by respondent, we believe that the trial court was capable of weighing that evidence and determining that $3,500 was a reasonable value for the services.

The judgment of the trial court is affirmed.

All concur.

---

reasonable value of the actual services rendered, available when there is an agency agreement, when the broker is the procuring cause, and when the parties have not agreed on the amount of commission); *Futch v. Guthrie*, 176 Ga.App. 672, 337 S.E.2d 384 (Ga.App.1985) (broker not have to establish that he or she is *the* procuring cause to recover under quantum meruit); *Edens View Realty & Inv. v. Heritage Enterprises*, 87 Ill.App.3d 480, 408 N.E.2d 1069, 408 N.E.2d 1069 (Ill.App.1980) (quantum meruit available when contract unenforceable); *Valley, Inc. v. Ward Parkway Bldg. Co., Inc.*, 3 Kan. App.2d 131, 590 P.2d 1100, 1102–03 (Kan.App. 1979) (if express contract, whether oral or written, broker may not avoid by arguing quantum meruit); *Steward Village Shopping Center, Ltd. v. Melbourne*, 332 A.2d 626, 629 (Md.App.1975) (suggesting a difference between the customary commission and the reasonable value of servic-

es). *Compare Boyd v. Margolin*, 421 S.W.2d 761, 767 (Mo.1967) (quantum meruit available) *with Kohn v. Cohn*, 567 S.W.2d 441, 447 (Mo.App. 1979) (discussing the possibility of recovering under an express or implied contract). *See also Montgomery v. Memorial Presbyterian Church*, 634 S.W.2d 201 (Mo.App.1982).

4. *See generally* G. Palmer, The Law of Restitution (1978); Restatement (Second) of Restitution, Tentative Draft No. 1, Introduction, § 1; Levmore, Explaining Restitution, 71 U.Va.L. Rev. 65 (1985). It is sometimes not recognized that scholars have argued that restitution is not merely a remedy, but it is also a *basis* for imposing an obligation under the theory of unjust enrichment. This can be distinguished from the law of quasi contract, from which the doctrine apparently evolved.