#28103-aff in pt & rev in pt-DG
**2018 S.D. 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DANIEL OSDOBA,                                        Plaintiff and Appellant,

> v.

AMY B. KELLEY-OSDOBA,                          Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE LAWRENCE E. LONG
Judge

\* \* \* \*

GREGORY T. BREWERS of
Strange, Farrell, Johnson
  & Brewers, P.C.
Sioux Falls, South Dakota            Attorneys for plaintiff and
                                     appellant.


KRISTINE K. O'CONNELL
ARON A. HOGDEN of
Woods, Fuller, Shultz
  & Smith, P.C.
Sioux Falls, South Dakota            Attorneys for defendant and
                                     appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 8, 2018
OPINION FILED **06/06/18**

GILBERTSON, Chief Justice

[¶1.]     This appeal concerns the divorce of Daniel Osdoba from Amy Kelley-Osdoba.  At the conclusion of the divorce proceedings, the circuit court accepted Amy's valuation of the parties' residence at $574,340, which differed from Daniel's valuation of $611,000 due to a 6% discount that accounted for realtor fees.  The circuit court also included Amy's student loans in the marital corpus.  The student loans were incurred while Amy attended medical school before the parties were married.  Further, the circuit court ordered Amy to make a cash-equalization payment to Daniel, but it allowed Amy to make the payment over time with an interest rate of 4%.  Daniel was also awarded alimony upon the condition that he annually release his medical and counseling records to Amy.  Finally, the circuit court denied Daniel's request for attorney fees.  Daniel appeals.  We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[¶2.]     Daniel and Amy met while Amy was attending medical school in Iowa City, Iowa.  Before that time, Daniel was working in Minneapolis after completing his Associate's Degree in Photographic Arts and Graphic Design.  Daniel eventually moved in with Amy but had a hard time finding work in Iowa City.  Daniel eventually found work in a restaurant.  Daniel and Amy were married on June 5, 2004, after Amy's last year of medical school.  Within a few weeks of being married, Daniel and Amy moved to Indianapolis, Indiana, where they would stay for the next four years as Amy completed her residency program.

[¶3.] During Amy's residency program, Daniel worked as a cook and a grocery-store stocker as he had a hard time finding a job in his field of study. Amy gave birth to twin boys during the third year of her residency program. After the birth of the twins, Daniel became a stay-at-home dad.

[¶4.] In 2011, Amy accepted a job at Sanford in Sioux Falls, South Dakota, as an ob-gyn specialist. The family moved to Sioux Falls from Des Moines, Iowa, where Amy was previously working after completing her residency program. While in Sioux Falls, Amy gave birth to their third son on August 16, 2012. Daniel continued staying at home and caring for the children at the couple's new home in Sioux Falls.

[¶5.] On January 26, 2015, Amy petitioned the circuit court for a temporary protection order after Daniel exhibited threatening behavior. The circuit court granted the temporary protection order. Daniel filed for divorce two days later, and Amy filed a counterclaim seeking the same. The court ordered Daniel to undergo a psychological evaluation, which resulted in a recommendation for psychotherapy and a dismissal of the temporary restraining order. However, Amy was granted a second temporary restraining order on October 20, 2015, after Daniel exhibited more threatening behavior. The circuit court concluded that Daniel's mental-health issues contributed to the failing marriage.

[¶6.] Subsequently, Daniel and Amy's divorce trial was held November 8-9, 2016. At the conclusion of the trial, the circuit court made partial rulings from the bench. The circuit court issued a decree of divorce for Daniel and Amy based on irreconcilable differences. The court also divided property, awarded Daniel

alimony, and set child support. On November 28, 2016, the circuit court issued a letter decision that supplemented its bench ruling. On December 30, 2016, the circuit court entered its final judgment and decree of divorce.

[¶7.]       Under its rulings relevant to this appeal, the circuit court accepted Amy's valuation of the parties' home at $574,340. This valuation was determined by taking a 6% discount for realtor fees from Daniel's proposed valuation of $611,000. The circuit court also included Amy's student-loan debt into the marital corpus that she had incurred during medical school. After division of the property, the circuit court ordered Amy to pay a cash-equalization payment of $45,364 to Daniel. However, the circuit court allowed Amy the option to make the equalization payment over 48 months with 4% interest. The circuit court also awarded Daniel alimony on the condition that Daniel provide an annual release of his medical and counseling records to Amy. Daniel will receive decreasing alimony payments starting at $3,000 a month and ending at $1,000 a month over 14 years. Finally, the circuit court denied Daniel's request for attorney fees.

[¶8.]       Daniel appeals, raising the following issues of alleged error:

1.  Whether the circuit court erred in its valuation of the marital residence.

2.  Whether the circuit court abused its discretion in including Amy's student-loan debt in the marital estate.

3.  Whether the circuit court abused its discretion in allowing Amy the option of making the equalization payment over time with 4% interest.

4.  Whether the circuit court abused its discretion in requiring that Daniel annually release his medical and counseling records to Amy as a condition of receiving alimony.

> 5. Whether the circuit court abused its discretion in declining to award Daniel his attorney fees.

**Standard of Review**

[¶9.] We review a circuit court's factual findings, which includes the valuation of property involved in a divorce proceeding, under the clearly erroneous standard of review. *Johnson v. Johnson*, 2007 S.D. 56, ¶ 16, 734 N.W.2d 801, 806; *accord* SDCL 15-6-52(a). "We will overturn the [circuit] court's findings of fact on appeal only when a complete review of the evidence leaves [this] Court with a definite and firm conviction that a mistake has been made." *Miller v. Jacobsen*, 2006 S.D. 33, ¶ 19, 714 N.W.2d 69, 76.

[¶10.] A circuit court's determinations in the division of property and on the issue of spousal support are reviewed under an abuse of discretion standard. *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d 617, 622. "A circuit court's ruling on the allowance or disallowance of costs and attorney fees is also reviewed by this Court under the abuse of discretion standard of review." *Terca v. Terca*, 2008 S.D. 99, ¶ 18, 757 N.W.2d 319, 324. "An abuse of discretion occurs when discretion is exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Id.* (quoting *Miller*, 2006 S.D. 33, ¶ 18, 714 N.W.2d at 76).

**Analysis and Decision**[1]

---

1. We note that Amy's brief to this Court has failed to cite authority in accordance with SDCL 15-26A-60(4), (6). *See* SDCL 15-26A-61 (stating that the appellees brief must conform to the requirements of § 15-26A-60). However, "the rule requiring supporting authority is addressed primarily to those who raise issues, not to those who respond to them." *Harris v. Young*, 473 N.W.2d 141, 146 (S.D. 1991). While it is poor strategy not to cite

(continued . . .)

-4-

[¶11.]    *1.    Whether the circuit court abused its discretion in its valuation of the marital residence.*

[¶12.]    Daniel first contends the circuit court erred in accepting Amy's valuation of the marital residence at $574,340.  He argues that the circuit court should have valued the residence at $611,000 and that the circuit court arbitrarily applied a 6% discount related to realtor fees.[2]

[¶13.]    "On review of a property division, this [C]ourt will not attempt to place valuation on the assets because that is a task for the [circuit] court as the trier of fact." *Johnson*, 2007 S.D. 56, ¶ 37, 734 N.W.2d at 810 (quoting *Geraets v. Geraets*, 1996 S.D. 119, ¶ 7, N.W.2d 198, 200).  "We do not require exactitude in the [circuit] court's valuation of assets; it is only necessary that the value lie within a reasonable range of figures." *Id.* ¶ 37, 734 N.W.2d at 810-11.  In other words, the circuit court is not obligated to accept either party's proposed valuation, "but the value must be within the range of evidence presented to the court." *Hill v. Hill*, 2009 S.D. 18, ¶ 14, 763 N.W.2d 818, 823.

[¶14.]    Here, Daniel introduced evidence that the appraised value of the residence was $611,000.  Likewise, Amy agreed with Daniel's appraised value, but she requested a 6% deduction from that value in contemplation of sales commission.

_____

(. . . continued)

supporting authority in response to Daniel's arguments, we assume Amy "stands by the judgment of the circuit court." *See id.*

2.    Daniel argued at trial, as well as on appeal, that the valuation range presented to the circuit court was from $611,000 to $644,000.  However, the only evidence presented regarding the appraised value of the property was evidence to support a $611,000 value.  Thus, like the circuit court, we will not consider the higher valuation.

Both parties' positions were presented to the court via "court's joint exhibit 1." It is apparent from the record that the circuit court accepted the appraised value Daniel seeks, but deducted the 6% requested by Amy. The court in essence accepted the net value of the residence, rather than the market value Daniel proposed. We have stated that "even if sale of the home [was] not immediately contemplated, it [is] reasonable for the [circuit] court to consider the net value of the house to the party who received it." *Abrams v. Abrams*, 516 N.W.2d 348, 351 (S.D. 1994). "Valuation is nothing more than a function of what the home is worth if it were to be presently sold; therefore, the costs of achieving that value should be considered." *Id.* at 350 (quoting *Zeigler v. Zeigler*, 530 A.2d 445, 447 (Pa. Super. Ct. 1987)).

[¶15.]     Nonetheless, Daniel disagrees with the 6% deduction and challenges the presence of any evidence necessary for its use. However, Daniel never objected to the reasonableness of the 6% value at trial; instead, he only took issue with the value of the residence to which the deduction would be applied and whether the deduction was appropriate at all.[3] *See id.* at 351 (noting that the husband did not

---

3.     While the dissent is correct in stating that Daniel opposed Amy's valuation of the marital residence, *see infra* ¶ 40, that opposition cannot be equated to an objection of the value of the 6% sales commission. Rather, the record clearly expresses that the parties disputed the gross valuation on the marital home and not the value of the 6% sales commission. Daniel even suggested during trial that the 6% sales commission should be taken from $644,000 rather than the $611,000 he proposed. Specifically, Daniel's counsel stated that "if they want to play these games about reducing it, then how about we use their own numbers at 644?" This Court has stated that a circuit court may consider the net valuation of a marital residence by deducting sales commission, *see Abrams*, 516 N.W.2d 348 at 351, and nothing in the record or our past cases suggests that a 6% sales commission is unreasonable, *see generally, e.g., Weiss v. Van Norman*, 1997 S.D. 40, 562 N.W.2d 113, 114 (involving sales agreement where realtor was to receive 6% sales

(continued . . .)

present evidence to dispute the amount of the closing costs). The circuit court correctly articulated the issue by stating, "I mean, my view of this question is, everybody is in agreement that the property is worth $611,000.00. The argument is whether or not it's appropriate to deduct the sale's [sic] commission." Because Daniel did not object to the value of the 6% deduction, he waives the issue on appeal. *See In re M.S.*, 2014 S.D. 17, ¶ 17 n.4, 845 N.W.2d 366, 371 n.4 (recognizing it is the standard policy of this Court that a party waives an issue on appeal if they fail to argue it at the circuit court below). As it was appropriate for the circuit court to consider the 6% deduction, we are not firmly convinced a mistake has been made in the court's net valuation of the marital residence. *See Miller*, 2006 S.D. 33, ¶ 19, 714 N.W.2d at 76.

[¶16.]      2.      *Whether the circuit court abused its discretion in including Amy's student-loan debt in the marital estate.*

[¶17.]      Daniel next argues that the inclusion of Amy's student-loan debt in the marital estate was an abuse of discretion because Amy had completed medical school before they were married. Daniel contends that the inclusion of the $101,999 in student-loan debt reduced his share of the marital assets by $51,000.

---

(. . . continued)

     commission); *Am. Prop. Servs., Inc. v. Barringer*, 256 N.W.2d 887 (S.D. 1977) (upholding realtor's sales commission of 6%), *superseded by statute on other grounds*; *see also Ham v. Morris*, 711 S.W.2d 187, 191 (Mo. 1986) (en banc) (stating that it is usual and customary for a real estate contract to contain 6% commission). Because a circuit court's decision is presumed correct, and we will not seek reasons to reverse, we are not "firmly and definitely convinced a mistake has been made" to disturb the circuit court's findings relating to the valuation of the marital residence. *Shedd v. Lamb*, 1996 S.D. 117, ¶¶ 17, 21, 553 N.W.2d 241, 244-45.

[¶18.]     "South Dakota is an all property state, meaning all property of the divorcing parties is subject to equitable division by the circuit court, regardless of title or origin." *Nickles v. Nickles*, 2015 S.D. 40, ¶ 32, 865 N.W.2d 142, 153 (quoting *Halbersma v. Halbersma*, 2009 S.D. 98, ¶ 9, 775 N.W.2d 210, 214).  In other words, "[t]he law requires the [circuit] court to make an equitable division of property, regardless of who owns the property." *Hill*, 2009 S.D. 18, ¶ 17, 763 N.W.2d at 824; *see* SDCL 25-4-44 ("When a divorce is granted, the courts may make an equitable division of the property belonging to either or both, whether the title to such property is in the name of the husband or the wife.").  However, "the law does not require perfection that would approach mathematical certainty." *MacKaben*, 2015 S.D. 86, ¶ 33, 871 N.W.2d at 628 (quoting *Pellegrin v. Pellegrin*, 1998 S.D. 19, ¶ 24, 574 N.W.2d 644, 649).

[¶19.]     When a circuit court divides property in divorce proceedings, "there is no rigid formula that must be followed, nor any fixed percentage to which either party is entitled." *Id.* (quoting *Clement v. Clement*, 292 N.W.2d 799, 801 (S.D. 1980)).  The factors that require consideration are:

> (1) the duration of the marriage; (2) the value of the property owned by the parties; (3) the ages of the parties; (4) the health of the parties; (5) the competency of the parties to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets.

*Nickles*, 2015 S.D. 40, ¶ 31, 865 N.W.2d at 153 (quoting *Novak v. Novak*, 2006 S.D. 34, ¶ 4, 713 N.W.2d 551, 552).  Although a circuit court must classify property as marital or non-marital in arriving at an equitable division of property, there exists broad discretion in the circuit court's classification.  *Id.* ¶ 32, 865 N.W.2d at 153.

"Only where one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as 'non-marital' property." *Novak*, 2006 S.D. 34, ¶ 5, 713 N.W.2d at 552-53.

[¶20.]       The instant case presents a different situation from cases upholding the inclusion of student-loan debt in the marital estate when the loans were incurred during the marriage. *See, e.g., Richarz v. Richarz*, 2017 S.D. 70, ¶ 20, 904 N.W.2d 76, 82 (affirming the circuit court's order requiring that husband pay 25% of wife's student-loan debt incurred during the marriage); *Hill*, 2009 S.D. 18, ¶ 17, 763 N.W.2d at 824 (upholding the circuit court's inclusion of wife's medical-school loans incurred during the marriage in the marital estate). Nonetheless, there is adequate support in the record to uphold the circuit court's inclusion of Amy's student-loan debt in the marital estate. Not only were Daniel and Amy living together before the marriage, but Daniel testified that the couple made a conscious decision to forgo paying on the student loans during the marriage to devote Amy's income to other endeavors. This indirectly benefited Daniel in the property division as more income was pledged to savings, investments, and other accounts. *See McLaren v. McLaren*, 665 N.W.2d 405, 408-09 (Wis. Ct. App. 2003) (finding no abuse of discretion in including student loans in marital estate because premarital and marital loans were not distinguished, and couple made a decision not to pay down the loans to benefit from the extra income). In the end, Amy was still apportioned the student-loan debt in the property division. *See Saint-Pierre v. Saint-Pierre*, 357 N.W.2d 250, 256 (S.D. 1984) (upholding the inclusion of the

parties' education debt in the marital estate when the debt was awarded to the party who accumulated it). Because the circuit court considered the factors necessary in dividing the property between Amy and Daniel, we find no reason to disrupt the circuit court's discretion in what appears on the record to be an equitable distribution of the parties' property.

[¶21.]     3.     *Whether the circuit court abused its discretion in allowing Amy the option of making the equalization payment over a time with 4% interest.*

[¶22.]     In its final judgment and decree of divorce, the circuit court ordered Amy to pay Daniel $45,365 as a cash-equalization payment. The circuit court allowed Amy the option to pay the equalization payment on a monthly basis, amortized over 48 months with 4% interest. Daniel contends the circuit court abused its discretion in allowing Amy to pay the equalization payment in this manner. Daniel argues that he is entitled to his respective property at the time of the judgment because no evidence was presented that showed Amy's inability to pay the full amount or that a legitimate purpose existed for delaying the equalization payment. However, the record indicates that Daniel failed to properly preserve this issue for appeal.

[¶23.]     "It is well established that 'we will not review a matter on appeal unless proper objection was made before the circuit court.'" *Halbersma*, 2009 S.D. 98, ¶ 29, 775 N.W.2d at 219 (quoting *Rogen v. Monson*, 2000 S.D. 51, ¶ 15 n.2, 609 N.W.2d 456, 460 n.2). "An objection must be sufficiently specific to put the circuit court on notice of the alleged error so it has the opportunity to correct it." *Id.* ¶ 29, 775 N.W.2d at 220. On November 28, 2016, the circuit court issued a written letter decision containing findings of fact, conclusions of law, and orders in the case.

The letter decision summarized the oral ruling made by the circuit court at trial and described the terms for which Amy was to make the equalization payment. On December 20, 2016, Daniel proposed his own findings of fact and conclusions of law. He also submitted a proposed judgment and decree of divorce on the same day. Yet, the only mention of the equalization payment in Daniel's proposals was to refute its overall amount. Daniel proposed that "[t]o equalize the distribution of assets and debts, Amy must pay to Daniel a cash equalizing payment of $154,212." The circuit court subsequently refused Daniel's proposals. Daniel then objected to the circuit court's final judgment and decree of divorce issued on December 30, 2016; however, he only objected to the extent that the decree was inconsistent with his prior proposed findings of fact, conclusions of law, and judgment and decree of divorce. Daniel did not object with any specificity to the circuit court's allowance of monthly equalization payments with 4% interest. *See id.* ("Merely filing a proposed amended judgment and decree of divorce is not sufficient."); *see also State v. Nelson*, 1998 S.D. 124, ¶ 7, 587 N.W.2d 439, 443 ("To preserve issues for appellate review litigants must . . . object to the action of the court, giving their reasons."). Because Daniel has not preserved the issue for our review, it is waived.[4]

---

4. We note that a circuit court is permitted to defer property payments over time with interest at the going rate for the convenience of a party. *Halbersma*, 2009 S.D. 98, ¶ 31, 775 N.W.2d at 220. However, an exception to this rule applies when a circuit court sets an interest rate lower than the going rate as an integral part of the overall property division. *See Lien v. Lien*, 278 N.W.2d 436, 444 (S.D. 1979) (holding that it was appropriate for the circuit court to set the interest rate of husband's deferred-property payments at 6%, instead of the going rate of 8.5% to 9.25%, because it was integral to the property division); *but see Grode v. Grode*, 1996 S.D. 15, ¶ 33, 543 N.W.2d 795, 803 (holding 1% interest rate did not meet the exception);

(continued . . .)

-11-

[¶24.]     *4.     Whether the circuit court abused its discretion in requiring that Daniel annually release his medical and counseling records to Amy as a condition of receiving alimony.*

[¶25.]     The circuit court ordered Amy to pay Daniel decreasing alimony payments that started at $3,000 a month and ended at $1,000 a month over a 14-year period. The circuit court, in its final judgment and decree of divorce, ordered Daniel to execute an annual waiver to allow Amy to obtain all of Daniel's counseling and medical records as a condition of receiving the alimony award. Daniel argues that the circuit court abused its discretion in requiring an annual release of his medical and counseling records to Amy as a condition of receiving alimony because it violates his physician- and psychotherapist-patient privileges.

[¶26.]     A circuit court has discretion to "compel one party to make such suitable allowance to the other party for the support during the life of that other party or for a shorter period, as the court may deem just, having regard to the circumstances of the parties represented; and the court may from time to time modify its orders in these respects." SDCL 25-4-41. Additionally, "[a] circuit court is required to consider the allocation of property and spousal support together." *Scherer v. Scherer*, 2015 S.D. 32, ¶ 10, 864 N.W.2d 490, 494 (quoting *Terca*, 2008 S.D. 99, ¶ 28, 757 N.W.2d at 326). It is "[t]he symbiotic relationship between property division and spousal support [that] requires consideration of the two together, as an award of more assets can eliminate or reduce the need for spousal

_____

(. . . continued)

> *Balvin v. Balvin*, 301 N.W.2d 679, 680-81 (S.D. 1981) (remanding for the circuit court to determine if the absence of an interest rate on deferred-property payment was an integral part of the property division). Still, Daniel did not preserve the issue for appeal, and we need not address whether the 4% interest rate was integral to the circuit court's property division.

support and vice versa." *Id.* Similar to the division of property, the factors a circuit court considers in awarding alimony include: "the length of marriage, earning capacity of the parties, financial condition after the property division, age, health and physical condition of the parties, parties' station in life or social standing, and fault." *Hill,* 2009 S.D. 18, ¶ 20, 763 N.W.2d at 825 (quoting *Wilson v. Wilson,* 434 N.W.2d 742, 745 (S.D. 1989)).

[¶27.]    Here, the circuit court considered the above factors before ordering the alimony award to Daniel. It found that the parties have been married 12 years; that Amy's earning capacity is robust compared to Daniel's, but Daniel has not yet reached his full earning potential; that Daniel's property division is weighed toward retirement investments to benefit him in the future; that Daniel has virtually no debt after the property division; that the parties will enjoy a reasonable station in life after separation; that the parties are about the same age and in good physical condition; and that Daniel has a history of mental issues, which contributed to the dissolution of the marriage. Pursuant to these factors, the circuit court found that Daniel met his burden in proving that he was in need of support and that Amy had sufficient means and abilities to provide such support. *See Kolbach v. Kolbach,* 2016 S.D. 30, ¶ 16, 877 N.W.2d 822, 828 (stating that in order to receive permanent alimony, a party has the burden of establishing the need for the support and the other party's ability and means to provide support).

[¶28.]    Nonetheless, Daniel argues that coupling such an award to the execution of a full waiver of his physician- and psychotherapist-patient privileges was an abuse of discretion. We agree. Absent a stipulation between the parties, it

#28103

would be a rare instance that a circuit court could require a party to waive his or her physician- or psychotherapist-patient privileges after the conclusion of a case.

[¶29.]     SDCL 19-19-503(b) provides the general rule regarding the privilege:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition, including alcohol or drug addiction, among himself, physician, or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

However, the statutory privilege is subject to three exceptions: (1) communications involving proceedings to hospitalize a patient for mental illness are not privileged; (2) communications involving court-ordered examinations of a party's or witness's physical or mental health are not privileged; and (3) communications involving the physical and mental condition of the patient are waived during trial or discovery if the condition is an element of the patient's claim or defense. SDCL 19-19-503(d). Also, if a person's physical or mental health is at issue during a civil proceeding, a waiver of the privilege during trial or discovery must be "narrow in scope, closely tailored to the time period or subject matter of the claim[,]" and provide for an in-camera review by the court if proper objection is made. SDCL 19-2-3.

[¶30.]     The waiver provisions above are limited to a waiver of the privilege during trial or discovery proceedings. As such, any waiver while the litigation is pending is limited to material relevant to the issue(s) pending before the court and does not waive the privilege in its entirety. *See Maynard v. Heeren*, 1997 S.D. 60, ¶ 18, 563 N.W.2d 830, 836-37, *abrogated on other grounds*, *Milstead v. Johnson*, 2016 S.D. 56, ¶¶ 34-35, 883 N.W.2d 725, 737-38. Thus, absent stipulation between

the parties, the waiver provided by statute is no longer available once the case has concluded. Because the exceptions to a claim of privilege are inapplicable to this case, the circuit court was without authority to order Daniel to sign a waiver at the conclusion of the proceedings, and the court abused its discretion in requiring Daniel to waive the privileges as a condition of receiving the alimony award. Should a motion for contempt or modification of the alimony award be filed in the future, the circuit court could then consider whether a waiver of the physician- or psychotherapist-patient privileges may be appropriate under the statute at that time.[5] *See Vandyke v. Choi*, 2016 S.D. 91, ¶ 10, 888 N.W.2d 557, 563 ("Under South Dakota law, alimony normally may be reduced or eliminated based on a change of circumstances existing at the time of the original decree[.]"). Accordingly, we reverse the circuit court's order requiring Daniel to waive the privilege and remand for the court to vacate this portion of the divorce decree.

[¶31.]     5.     *Whether the circuit court abused its discretion in declining to award Daniel his attorney fees.*

[¶32.]     Daniel's final argument maintains that the circuit court abused its discretion in declining to award him attorney fees. "Generally, [circuit] courts may award attorney fees in cases involving divorce, support, or alimony." *Huffaker v.*

---

5.     If this occurs, the circuit court must enter findings to support a justifiable connection between Daniel's alimony award and conditioning such alimony on Daniel's need for mental-health treatment. The court found that Daniel's alimony award allowed him to "maintain a reasonable life style, support his children, and continue professional treatment for his mental health issues." While this does not support the circuit court's order requiring an annual waiver, it could serve as a basis for modification to the alimony award based on a change of circumstances from those existing at the time of the original divorce decree.

*Huffaker*, 2012 S.D. 81, ¶ 32, 823 N.W.2d 787, 794 (citing SDCL 15-17-38).

Typically, a two-step process is used by circuit courts in determining whether

attorney fees should be awarded. *Id.* (quoting *Urbaniak v. Urbaniak*, 2011 S.D. 83,

¶ 31, 807 N.W.2d 621, 628). "First, the court must determine what constitutes a

reasonable attorney's fee. . . . Second, it must determine the necessity for such fee."

*Id.*

[¶33.]     Here, Daniel requested that the circuit court order Amy to pay

$33,007.89 in attorney fees. The circuit court denied Daniel's request in its final

judgment and decree of divorce by stating that "[e]ach party is hereby required to

pay their own attorney's fees in this matter." Upon review of the record, the circuit

court did not enter findings of fact and conclusions of law when it denied Daniel's

request for attorney fees. "Without findings of fact and conclusions of law there is

nothing to review." *Nickles*, 2015 S.D. 40, ¶ 35, 865 N.W.2d at 154 (quoting

*Chrisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 30, 687 N.W.2d 507,

514). Thus, we reverse and remand for the circuit court to enter findings of fact and

conclusions of law on Daniel's request for an award of attorney fees.

### Conclusion

[¶34.]     We conclude that the circuit court did not commit clear error in

accepting the net valuation of the marital residence at $574,340. The circuit court

based its valuation on taking a 6% discount for realtor fees from the market value of

$611,000 that Daniel requested. Because Daniel waived the issue to challenge the

reasonableness of the 6% discount, we affirm the circuit court's valuation.

Additionally, the circuit court did not abuse its discretion in including Amy's

premarital-student loans in the marital estate because Daniel benefited in the property division by deferring payment on the loan to increase the value of other accounts and Amy was apportioned the student-loan debt in the final property division. The circuit court abused its discretion in requiring Daniel to release his medical and counseling records as a condition of receiving alimony because the court lacked statutory authority to order Daniel to waive his physician- and psychotherapist-patient privileges at the conclusion of the case. Finally, we reverse and remand the issue involving Daniel's request for an award of attorney fees for the circuit court to enter findings of fact and conclusions of law.

[¶35.]        Therefore, the judgment of the circuit court is affirmed in part, reversed in part, and remanded for consideration consistent with this opinion.

[¶36.]        ZINTER, SEVERSON, and JENSEN, Justices, concur.

[¶37.]        KERN, Justice, concurs in part and dissents in part.



KERN, Justice (concurring on Issues 2, 3, 4, and 5 and dissenting on Issue 1).

[¶38.]        I concur on Issues 2 through 5 but respectfully dissent on Issue 1 for several reasons. I agree that the circuit court properly valued the marital residence at $611,000 based on the appraised value of the home as reflected in Exhibit 1 and by stipulation of the parties. But although the parties agreed on the appraised value, Amy listed $574,340 as the "net value" of the home on Exhibit 1. At trial, Amy's counsel agreed with the court's observation that this followed "the practice of [a now-retired judge that] . . . routinely would deduct the cost of the . . . sale for the

real estate commission." Counsel also argued that our holding in *Abrams v. Abrams*, 516 N.W.2d 348 (S.D. 1994), supported such a deduction.

[¶39.]     However, unlike *Abrams*, Amy introduced no evidence supporting a 6% reduction. *See id.* at 350 ("At the time of trial, [Wife] . . . presented an estimated statement showing all costs that would be incurred upon sale of the house, including brokerage commission, real estate taxes, and other fees.") While "it is only necessary that the value lie within a reasonable range of figures," *Johnson v. Johnson*, 2007 S.D. 56, ¶ 37, 734 N.W.2d 801, 811, the valuation must nonetheless lie "within the range of evidence *presented to the court*," *Richarz v. Richarz*, 2017 S.D. 70, ¶ 10, 904 N.W.2d 76, 80 (emphasis added); *accord Hill v. Hill*, 2009 S.D. 18, ¶ 14, 763 N.W.2d 818, 823. Amy produced no evidence of the standard rate for real-estate commissions in the area, yet the circuit court reduced the value of the home by nearly $36,000. While the court could freely "accept[] the net value of the residence, rather than the market value Daniel proposed," Majority ¶ 14, to do so without reference to any evidence constitutes clear error.

[¶40.]     Although the majority contends that Daniel waived the issue on appeal for failure to object to the 6% deduction at trial, this mischaracterizes the proceedings. Daniel adamantly opposed any value less than $611,000. The dispute over the 6% deduction arose after Daniel attempted to introduce Exhibit 39, which indicated an appraised value of $644,000. Daniel argued that Exhibit 39 demonstrated that the home's value ranged between $611,000 and $644,000, contending that "it wouldn't be just to reduce this to 574" as a result. At the court's urging, Daniel agreed to instead offer Exhibit 1, which prompted the court to ask

Amy whether she objected. Amy, apparently referencing the $611,000 figure, objected only "to using the value without applying the *Abrams*' case." From the colloquy, it is apparent that Daniel not only disagreed with the application of a deduction, but he also disagreed that reducing the value of the home by 6% from $611,000 would be reasonable. Thus, it cannot be said that "Daniel did not object to the value of the 6% deduction[.]" Majority ¶ 15. Although Daniel's counsel remarked that "if they want to play these games about reducing it, then how about we use their own numbers at 644," the comment cannot sensibly be construed as an admission that the 6% deduction was reasonable. Even taken at face value, the statement only suggests that if the court did apply a 6% deduction, Daniel wanted the court to use the higher $644,000 figure—one for which he did not ask.

[¶41.] Moreover, the majority does not make clear when Daniel should have objected and to what. The foregoing exchange occurred during *Daniel's* motion to introduce Exhibit 39. Amy did not move the court to apply a 6% deduction, and the court did not grant such a motion. How then could Daniel waive the issue on appeal? Further, even if Daniel did not object to the *application of Abrams*—which Amy ultimately requested with respect to Exhibit 1—our decision in *Abrams* conformed with the requirement that a valuation *must* be supported by evidence *presented to the court. See* 516 N.W.2d at 350. Here, Amy offered none. The majority's suggestion that a 6% deduction is per se reasonable and thus does not need to be supported by the evidence, Majority ¶ 15 n.3, contradicts this

well-established rule, and the cases cited by the majority do not support the majority's position.[6]

[¶42.]      Other courts have taken issue with the kind of routine deduction applied here to a home's value. In *Zeigler v. Zeigler*, 530 A.2d 445, 445 (Pa. Super. Ct. 1987), the Pennsylvania Superior Court "decline[d] to adopt such a[n automatic] rule for all cases, or even for all cases in which an immediate sale is intended[.]" The court observed that "such an *intention* is not easily susceptible to proof" and that "the proper amount to deduct for costs of sale would be a matter of speculation" without evidence establishing the same. *Id.* at 447 (emphasis added). While in *Abrams*, "the record indicate[d] that there were, during the pendency of the divorce in the lower court, plans to sell the house," 516 N.W.2d at 351, here the record reflects no such plan. Indeed, neither Amy nor the circuit court offered any basis for applying a 6% deduction, and to hold as the majority does could subject property to an automatic discount even where doing so would be arbitrary. For example, "it

---

6.      The South Dakota cases cited by the majority involved real-estate listing agreements specifying a 6% sales commission. *Weiss v. Van Norman*, 1997 S.D. 40, 2, 562 N.W.2d 113, 114; *Am. Prop. Servs., Inc. v. Barringer*, 256 N.W.2d 887, 889 (S.D. 1977). Here, no such agreement exists. Although a 6% sales commission may be reasonable or common, the issue before us is whether a party needs to present evidence supporting a deduction. Our case law suggests that evidence must be presented. *See Richarz v. Richarz*, 2017 S.D. 70, ¶ 10, 904 N.W.2d 76, 80.

The Missouri case cited by the majority, *Ham v. Morris*, involved an oral listing agreement providing a 6% sales commission. *See* 711 S.W.2d 187, 188-89 (Mo. 1986). Because the broker failed to meet the condition precedent for receiving a sales commission, the Missouri Supreme Court affirmed the lower court's holding in favor of the seller. *Id.* at 190. Even if a 6% sales commission is "usual and customary," as the broker argued, *id.* at 188, the case does not suggest that we should dispense with our traditional evidentiary burdens. *See Zeigler v. Zeigler*, 530 A.2d 445, 445 (Pa. Super. Ct. 1987).

is not uncommon for an owner to undertake a sale without the assistance of a realtor[.]" *Zeigler*, 530 A.2d at 447.

[¶43.]     While a deduction for expenses associated with a contemplated sale of a home may be appropriate in some cases, here the circuit court erred by applying a deduction not supported by any evidence in the record. *See id.*  Further, Daniel did not waive the issue for failing to object to the reasonableness of the deduction.  On remand, the 6% deduction should be eliminated and the property division recalculated.  Therefore, I respectfully dissent on Issue 1.