#29558, #29582-aff in pt & rev in pt-SRJ
**2022 S.D. 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CHRISTOPHER ALAN DUNHAM,                    Plaintiff and Appellant,

v.

SUSAN MICHELLE SABERS,                    Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE RODNEY J. STEELE
Retired Judge

\* \* \* \*

ELIZABETH A. ROSENBAUM
MEGAN R. DEDONCKER of
Elizabeth A. Rosenbaum, P.C.
Sioux City, Iowa                    Attorneys for plaintiff
                                    and appellant.


WILLIAM P. FULLER
MOLLY K. BECK of
Fuller, Williamson, Nelsen &
    Preheim, LLP
Sioux Falls, South Dakota                    Attorneys for defendant
                                    and appellee.

\* \* \* \*

ARGUED
MAY 25, 2022
OPINION FILED **10/26/22**

#29558, #29582

JENSEN, Chief Justice

[¶1.]    The circuit court granted a divorce to Christopher Dunham and Susan Sabers on the grounds of irreconcilable differences.  The court resolved issues involving child custody and support, the valuation and division of marital assets, and attorney fees.  Dunham appeals portions of the circuit court's rulings on each of these issues.  Sabers filed a notice of review appealing the circuit court's rulings regarding the grounds for divorce, property division and valuation, and attorney fees.  We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[¶2.]    Dunham and Sabers began dating in 1997.  At the time, Sabers owned her own home (Belmont House).  Dunham moved in with Sabers in 1998.  They were married in 2002, and two children were born during the marriage, Q.S.D. (DOB 5/31/2003) and Z.S.D. (DOB 4/11/2005).  In 2004, Sabers sold the Belmont House.  Dunham and Sabers used the proceeds as a down payment to build a new home (Marital Home).

[¶3.]    Sabers was a partner at the law firm of Woods, Fuller, Shultz & Smith P.C. (Woods Fuller) at the time of the marriage.  Sabers left Woods Fuller in January 2006 to begin a law practice with William Fuller called Fuller & Sabers LLP (Fuller & Sabers).  Sabers received a buy-out from Woods Fuller and contributed the funds to buy into Fuller & Sabers and Dakota Law, LLC (Dakota Law), an entity that owned the building where Fuller & Sabers was located.  Sabers and Dunham each owned a 25% interest in Dakota Law, while Fuller and his spouse owned the other 50% interest.  Sabers left Fuller & Sabers in 2013 when she

was appointed as a circuit court judge in the South Dakota Second Judicial Circuit. She received buy-outs from Fuller & Sabers of $86,670 and Dakota Law of $216,410.22. Sabers continues to serve as a judge in the Second Circuit.

[¶4.] Dunham was working in residential real estate sales with his mother, Karen Dunham, when the parties were married. Later, Dunham was involved in real estate development and other business operations with his father, Donald Dunham Jr. In 2012, Dunham began working at the Dunham Company, a real estate development and management company owned by Donald.

[¶5.] During the parties' marriage, Dunham acknowledged that Sabers "was the breadwinner of the family." There was also testimony that Dunham had some business setbacks during the marriage and that he and Sabers received some financial assistance from Donald. Dunham claimed he contributed to the marriage by supporting Sabers in her career, staying home with the children, and helping plan and construct the Dakota Law building. Sabers disputed Dunham's assertions and testified that she did most of the caretaking and housework and that nannies had helped care for the children until at least 2009. Sabers also claimed that Dunham made no financial contribution to Fuller & Sabers or Dakota Law and that all the equity in the building represented contributions from her buy-outs from Woods Fuller and Fuller & Sabers. Sabers also claimed that she supported Dunham professionally by helping Dunham with the design and sale of homes built by Dunham's company, Milestone Consulting and Construction Services (Milestone), and by providing legal services for Dunham's business ventures.

[¶6.]     Donald passed away in January 2013, and Dunham was named the personal representative in the probate of Donald's will (Estate). Donald had also created the Living Trust of Donald Dunham Jr. (Trust) in 2006. Donald's will provided that the assets he owned at the time of his death would pour into the Trust so that all of Donald's assets would be owned by the Trust. Dunham is the primary discretionary beneficiary of the Trust. After Donald's death in 2013, Dunham received approximately $322,000 in life insurance proceeds outside the Estate.

[¶7.]     Dunham began discussions to purchase the Dunham Company in the spring of 2013 but did not inform Sabers until September 2013. This disclosure caused major problems in their relationship and ultimately led to their separation. Sabers was concerned about the financial risk this purchase may have had on the parties' finances. Upon her request, Dunham transferred the title to the Marital Home, vehicles, and joint bank account to Sabers to protect the assets from business debt taken on by Dunham. Dunham bought 100% of the Dunham Company for $1.5 million in the fall of 2013.

[¶8.]     Dunham left the Marital Home in September 2013 and moved in with his mother Karen. Dunham moved into a townhome owned by Milestone in 2016. Sabers paid the mortgage and interest payments on the Marital Home during the marriage and following the separation.

[¶9.]     In July 2016, Dunham filed a complaint for a divorce from Sabers on the grounds of irreconcilable differences and extreme cruelty and sought shared legal and physical custody of the children and child support. Sabers answered the

complaint and counterclaimed seeking a divorce on the grounds of irreconcilable differences and extreme cruelty. She requested sole legal and physical custody of the children, child support, alimony, and attorney fees. Dunham subsequently amended his complaint to include a request for alimony and attorney fees. He later abandoned his alimony claim.

[¶10.] Sabers retained physical custody of the children since the separation. In July 2016, the court entered a parenting time order that provided Dunham time with the children every Wednesday evening and rotating Saturdays and Sundays every other week. In January 2018, the court ordered supervised parenting time for Dunham following a hearing where Sabers presented evidence of several physical altercations between Dunham and Q.S.D.[1] Dunham claimed the incidents were disciplinary responses to Q.S.D.'s behaviors. Subsequently, Dunham filed a motion seeking an order for the children to attend counseling and an order for a custody evaluation. The court denied Dunham's request for counseling. However, the court ordered Dr. Stephan Langenfeld, a licensed psychologist in Sioux Falls, to interview and assess both Q.S.D. and Z.S.D. Following the assessment, Dr. Langenfeld opined that neither child needed counseling and that Q.S.D. should not be ordered to have parenting time with Dunham. The court denied three subsequent motions by Dunham seeking counseling with the children.

---

1.   Sabers claimed that the most recent altercation occurred on December 2, 2017. Sabers testified that Q.S.D. told her that Dunham punched him in the face and pushed him to the ground. Sabers submitted photos of Q.S.D. showing injuries to his face and arms.

[¶11.] In March 2018, the court ordered a custody evaluation to be conducted by Dr. Judy Zimbelman. Dr. Zimbelman opined that Sabers had contributed to Dunham's strained relationship with the children, but that Dunham's physical abuse was the primary cause of the estrangement. Dr. Zimbelman recommended that Dunham initially attend counseling, before including the children, and that Sabers should have sole physical custody with parenting time for Dunham consistent with the order already in place.

[¶12.] Dunham was initially ordered to pay child support in 2018. Previously, Dunham had voluntarily paid for a portion of the children's parochial school tuition expenses for the 2014–2015 school year but had not provided any other child support to Sabers since their separation in 2013. Q.S.D. and Z.S.D. were in high school at the time of the divorce trial, and both had attended parochial school since they began their schooling.

[¶13.] Throughout the proceedings, Dunham refused to produce information related to the Estate and the Trust. Sabers filed three motions to compel in the divorce action in May 2019, October 2019, and May 2020. Sabers also filed five motions for continuance of the trial because of Dunham's refusal to produce discovery. The court granted four of the five motions for continuance.

[¶14.] A five-day divorce trial was held in August 2020. Each party called a financial expert and presented evidence concerning the valuation of various business interests owned by Dunham and Sabers. At the time of the trial, the court found Dunham, individually, had a 100% ownership interest in the Dunham

Company, a 50% interest in American Land Development Company (ALDC),[2] and a 100% interest in Milestone.[3] The evidence was undisputed that in 2014 Dunham invested $141,000 into ALDC and $82,000 into Milestone from the life insurance proceeds that he received after Donald's death. Additionally, Sabers and Dunham each owned 50% of QAZ, LLC (QAZ), a holding company formed for estate planning purposes in 2008. QAZ owned 20% of Dunham Partnership, a real estate development entity, and 10% of Dunham Equity Management, the latter of which both experts agreed had no value.

[¶15.] Donald's Estate remained open at the time of trial. Prior to trial, the Estate acquired the 20% interests in Dunham Equity Management and Dunham Partnership that Dunham's two half-brothers each owned. Dunham bought their separate interests in 2016 and then transferred those interests to the Estate in 2017. Dunham explained that the Estate did not have the funds to acquire these interests, and therefore he served as the conduit for the purchases. The Estate also purchased a 92% interest in Tatar Quincey, another real estate holding company, for $1.8 million in 2018. Dunham testified that the Estate obtained a loan for $1.4 million to finance the purchase.

---

2.    ALDC is a holding company that was started by Dunham and Karen in 2014 and owns an 8% interest in Tatar Quincey, LLC (Tatar Quincey), an office building where the Dunham Company is located, a storage facility, and a 95.24% interest in Hospitality Apartments and Bar.

3.    Dunham's tax returns and other legal documents presented at trial showed Dunham owned a 100% interest in Milestone. The court rejected testimony from Dunham and Karen that they each owned a 50% interest in Milestone as a "constructive partnership." The only remaining asset in Milestone at the time of trial was the townhome in which Dunham resides.

[¶16.] The circuit court granted the parties a divorce on the grounds of irreconcilable differences, finding that the parties had difficulties in their relationship for years, stemming from their different personalities. The court awarded the parties joint legal custody, awarded Sabers sole physical custody, and gave Dunham unsupervised visitation privileges. However, the court permitted the children to choose the time, location, and length of these visits.

[¶17.] The court also ordered Dunham to pay ongoing monthly child support to Sabers in the amount of $1,119, along with back child support from 2013, interest on the child support, and unreimbursed medical expenses in the total amount of $119,729. In calculating child support, the court included all of Dunham's Schedule E income from his federal tax returns. The court also entered findings for an upward deviation to the statutory child support guidelines and ordered Dunham to reimburse Sabers for half of the children's past parochial school tuition expenses in the amount of $26,905 and half of the children's future parochial school tuition expenses on a monthly basis. The court declined Dunham's request for a credit against child support for the buy-out funds from Dakota Law and Fuller & Sabers that Sabers used to support herself and the children during the separation. The court also denied Dunham's requested credit of $217,115 for in-kind contributions he claimed to have made for the children's benefit before a child support order was entered in 2018. The court ordered the parties to exchange future tax returns, to calculate child support until Z.S.D. graduated or reached the age of majority.

[¶18.] The circuit court also classified, valued, and divided the marital property, with Dunham receiving $1,199,979 in marital assets and Sabers receiving

$674,159 in marital assets. The court equalized the property division to a 50/50 split of marital property by ordering Dunham to pay Sabers a cash equalization payment of $262,905.

[¶19.] Relevant to this appeal, the court awarded Sabers the Marital Home with a value of $675,000, less a non-marital offset of $78,804 for the down-payment Sabers contributed from the sale of the Belmont House and personal bank accounts. The court also awarded Sabers the South Dakota Retirement System (SDRS) account, valued at $163,088 with a non-marital offset of $149,308, reflecting contributions made to the account after the separation; the Supplemental Retirement account for $4,171 with a non-marital offset of $3,966; and a Wells Fargo checking account at zero dollars. The court did not include the Fuller & Sabers and Dakota Law buy-out funds, which Sabers controlled and spent during the separation, as marital property.

[¶20.] The court valued and awarded to Dunham the following property: 2001 Ford F-150 for $2,025; 1969 Firebird for $18,000; the Dunham Company for $171,000; QAZ's 20% ownership of the Dunham Partnership at $260,000; QAZ's interest in Dunham Equity Management at zero dollars; 50% interest in ALDC for $330,000; and 100% interest in Milestone at $105,000. The court excluded as non-marital property the Estate's interests in Tatar Quincey, Dunham Equity Management, and Dunham Partnership.

[¶21.] The circuit court denied Dunham's requested non-marital offset for the life insurance proceeds from his father that he invested in ALDC and Milestone in the amounts of $141,000 and $82,000, respectively. The court also denied

Dunham's request for a credit of $40,907 for rent he claimed he owed to Milestone. The court also excluded the Yukon from the marital estate.

[¶22.]     Dunham raises thirteen issues on appeal, and Sabers cross-appeals four issues.[4]  We restate Dunham's issues as follows:

> 1.     Whether the circuit court abused its discretion in its visitation order.
>
> 2.     Whether the circuit court abused its discretion by including income from various entities owned by Dunham to determine child support, in denying Dunham's claimed credits against his child support, and in ordering an upward deviation to Dunham's child support obligation for parochial school tuition.
>
> 3.     Whether the circuit court abused its discretion in classifying certain property as marital or non-marital.
>
> 4.     Whether the circuit court erred in its valuations of certain marital property.
>
> 5.     Whether the circuit court erred in considering Dunham's interest in the Trust when determining his financial condition.
>
> 6.     Whether the circuit court abused its discretion in awarding Sabers $50,000 in attorney fees.
>
> 7.     Whether the circuit court abused its discretion by mandating the parties to exchange tax returns every year until the expiration of the child support order.

---

4.     Dunham's briefs and statements at oral argument are interspersed with suggestions that he was treated unfairly, while Sabers was given favorable treatment by the circuit court because of her position as a judicial officer. Dunham's claims of judicial bias are wholly unsupported by the record and unbefitting of the professionalism this Court expects of appellate counsel.  To the contrary, our review of the record reveals that the circuit court was patient and treated both parties fairly and respectfully throughout more than four years of contentious litigation.

Sabers raises the following issues by notice of review:

1.    Whether the circuit court abused its discretion in its classification of certain business entities as non-marital property.

2.    Whether the circuit court abused its discretion in its equitable division of the marital property.

3.    Whether the circuit court abused its discretion in failing to grant Sabers a divorce on the grounds of extreme cruelty.

4.    Whether the circuit court abused its discretion in awarding Sabers $50,000 in attorney fees.

## Analysis

### *1.    Child custody orders.*

[¶23.]    "The trial court has broad discretion in awarding custody of minor children and likewise visitation rights; therefore, the trial court's decision can only be reversed upon a clear showing of an abuse of that discretion." *Pieper v. Pieper*, 2013 S.D. 98, ¶ 11, 841 N.W.2d 781, 785 (citation omitted).  Likewise, "[t]rial courts possess broad discretion in deciding the best interests of a child[.]" *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, ¶ 22, 591 N.W.2d 798, 807.  "An abuse of discretion is 'a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" *Pieper*, 2013 S.D. 98, ¶ 11, 841 N.W.2d at 785 (citation omitted).

[¶24.]    This Court has recognized that "[i]n most instances, 'it will be in the best interests of children that they receive the love, affection, training, and companionship of their noncustodial parent.'" *Id.* ¶ 15, 841 N.W.2d at 786 (citation omitted).  However, "where the evidence establishes that exercise of visitation will

be harmful to the welfare of the children[,] . . . the right of the noncustodial parent to visit with [the] children can be limited . . . ." *Id.* (citation omitted).

[¶25.]  The circuit court denied several pretrial motions by Dunham to require counseling with the children to address their animosity toward him.  In the final order, the court granted Dunham visitation privileges with Z.S.D., but permitted Z.S.D. to choose the time, location, and length of the visits.  Dunham argues that the circuit court abused its discretion by not ordering counseling and in permitting Q.S.D. and Z.S.D. to decide the parameters for visitation with Dunham.[5]

[¶26.]  Both experts retained to address the custody issues opined that the children should not be forced to attend visitation with Dunham, and neither expert recommended mandatory counseling for the children.  Further, the circuit court interviewed both children about their preferences for visitation.  Z.S.D., who was 15 years old at the time of the trial, expressed a preference for a flexible schedule to visit his father.  The court may consider the child's preference "[i]f the child is of a sufficient age to form an intelligent preference[.]" *Fuerstenberg,* 1999 S.D. 35, ¶ 30, 591 N.W.2d at 809 (quoting SDCL 25-4-45).  "[I]t is especially important to give attention to the needs and wishes of children either approaching or in adolescence." *Id.*  In view of all the evidence, the circuit court acted within its discretion by not mandating counseling and in allowing Z.S.D. to choose his visitation with Dunham.

---

5.  Custody and visitation orders involving Q.S.D. are now moot as Q.S.D. has reached the age of majority.

### 2. *Calculation of child support.*

[¶27.]     This Court will not disturb an award of child support "unless the trial court clearly abused its discretion." *Roberts v. Roberts*, 2003 S.D. 75, ¶ 8, 666 N.W.2d 477, 480 (citation omitted). We review findings of fact "under the clearly erroneous standard. This Court must be left with a definite and firm conviction that a mistake has been made to overturn a circuit court's findings." *Id.* (citation omitted). "Questions of law are reviewed de novo." *Id.* (citation omitted).

> a.     *Inclusion of Dunham's Schedule E income in the calculation for past and current child support.*

[¶28.]     Dunham argues that the circuit court erred by including the Schedule E income shown on his federal income tax returns to calculate child support.[6] He asserts that he did not receive most of the Schedule E income shown on the returns and did not have control over the distribution of income from these entities.

[¶29.]     "The duty to provide for one's children is a parent's first duty." *Sazama v. State ex rel. Muilenberg*, 2007 S.D. 17, ¶ 20, 729 N.W.2d 335, 343 (citing *Taecker v. Taecker*, 527 N.W.295, 298 (S.D. 1995); SDCL 25-7-6.1). A parent's obligation to provide child support "must be in accordance with the means of the

---

6.     "Income from rents, royalties, partnerships, S corporations, estates, and trusts. Schedule E of Form 1040 is used to report supplemental income and loss on the U.S. individual income tax return." Miscellaneous Income, West's Tax Law Dictionary § M1320. "Quite often, the income reported on Schedule E . . . is the distributive share of a larger investment in which the taxpayer owns an interest. Regardless of whether the interest is a minority or controlling interest, the distributive share reported on Schedule E may not in fact have been distributed. It may only be a paper allocation of the investor's share without the actual cash distribution." R. Victor Haas, Jr., *Valuation Strategies in Divorce* § 2.32 Supplemental Income and Loss (Form 1040, Schedule E) (5th ed. 2021).

parent." *Roberts*, 2003 S.D. 75, ¶ 11, 666 N.W.2d at 480; *see* SDCL 25-7-6.1. "The 'means' of a parent include [the] income, if that income is sufficient to meet the child's needs, or [the] income and assets if income alone is not sufficient." *Roberts*, 2003 S.D. 75, ¶ 11, 666 N.W.2d at 480; *see* SDCL 25-7-6.5. A parent's income "must be *received* from those sources identified by SDCL 25-7-6.3[]" before it is included in the parent's monthly gross income. *Roberts*, 2003 S.D. 75, ¶ 17, 666 N.W.2d at 482 (emphasis added). "A parent 'receives' income when the allotted amount could be used by the parent to 'support himself/herself and, thus, [the] child.'" *Nace v. Nace*, 2008 S.D. 74, ¶ 7, 754 N.W.2d 820, 823 (quoting *Roberts*, 2003 S.D. 75, ¶¶ 14–15, 666 N.W.2d at 482). "[W]hen a parent can control whether or not a corporation distributes income to that parent, some or all of corporation's retained earnings can be counted in the parent's gross income." *Roberts*, 2003 S.D. 75, ¶ 21, 666 N.W.2d at 483. "A shareholder may be considered to have control over and to have received retained company income if the shareholder has the ability to direct distributions." *Nace*, 2008 S.D. 74, ¶ 8, 754 N.W.2d at 823. A parent's control over the distributions "is a fact specific inquiry." *Id.*

[¶30.]     To determine whether a person has control over a company's distributions, the court may consider:

> (1) comparison of the amount of retained income versus the parent/obligor's gross income and percent of ownership; (2) a history or pattern of past retained income; (3) the company's need to retain income to "maintain or increase past or current levels of income production as opposed to unnecessary, premature, unrelated or overly aggressive expansion of business[]"; (4) whether the retained income is acquired from the current year's profits or out of past year(s)' savings; (5) comparison of the ordinary rate of return for a similar investment; (6) the ability to receive favorable or fictitious loans

(constructive distributions) from the company; and (7) "any other factor that bears on the issue of whether the obligor is manipulating his or her income in an effort to avoid the proper payment of child support."

*Id.* ¶ 9, 754 N.W.2d at 823 (internal citations omitted).

[¶31.] In finding that Dunham had control of the income on Schedule E of his return, the circuit court examined the factors from *Nace* and found that all of the business decisions for the Dunham Company, ALDC, Tatar Quincey, Milestone, and Hospitality Apartments and Bar "are either wholly or de facto controlled by [Dunham]." The record supports the court's determination that Dunham had the ability to control the income from the various business entities as well as the Estate. While Karen had an interest in some of the entities at issue, Dunham is Karen's only child, and the court found that they have a close relationship. On this record, the circuit court did not abuse its discretion by including Dunham's Schedule E income to calculate child support.

> b.    *Denial of Dunham's claimed child support credits.*

[¶32.] Dunham argues that the Dakota Law and Fuller & Sabers buy-out funds were marital property and that he should have been given a credit against his child support obligation for Sabers's use of these funds to pay for the children's school tuition and living expenses while the divorce was pending. Dunham also asserts that he should have received credit for the food and entertainment expenses he incurred for the children during his parenting time.

[¶33.] A court may provide a noncustodial parent with a child support credit for any direct payments made for the benefit of a child prior to the entry of a child support order. *See State, ex rel., Tegegne v. Andalo*, 2015 S.D. 57, ¶ 20, 866 N.W.2d

550, 556 (holding that a child support referee did not commit clear error in giving credit to the noncustodial father who presented evidence that he made mortgage payments for the home where the children lived and purchased food for them prior to the entry of a child support order). In upholding the credit in *Tegegne*, this Court stated "there is nothing in SDCL 25-7-6.1 or our cases suggesting that, when there is no order specifying the manner of making support, an obligor's support may only be made by cash payments to the obligee." *Id.* ¶ 14, 866 N.W.2d at 554–55.

[¶34.] The credit in *Tegegne* was limited to *actual payments* made by the noncustodial parent for expenses relating to the children. *Id.* ¶ 15, 866 N.W.2d at 555. Dunham does not cite any authority from South Dakota to support his claim that a noncustodial parent is entitled to credit against child support for the custodial parent's use of marital funds to pay expenses for the children. Rather, to the extent one spouse used marital funds during the separation for child support or other purposes, the issue should be addressed in the division of property, not as a credit against child support. As the circuit court correctly determined in its memorandum decision, child support is generally calculated from the current income. The circuit court's reasoning is consistent with our statutory scheme of calculating child support obligations based upon current income, not assets owned. *See* SDCL 25-7-6.2 and SDCL 25-7-6.3. On this record, we find no abuse of discretion by the circuit court in denying a child support credit to Dunham for alleged marital funds expended by Sabers to care for the children.

[¶35.] Dunham also seeks credit for expenditures he claims to have made from December 2012 through November 2018 when there was no child support

order in place. With respect to these expenditures, the circuit court found that Dunham did not satisfy his evidentiary burden to support his requested credit for in-kind support contributions. *See Tegegne*, 2015 S.D. 57, ¶ 20, 866 N.W.2d at 556 (finding sufficient evidence to support an award for in-kind contributions when the father presented receipts for food purchases). Dunham's evidence consisted of a ledger he prepared containing general descriptions of purchases, but the ledger did not include receipts. Many of the expenditures were for discretionary expenses, such as entertainment, hotels, and eating out. Further, there was evidence that some of the expenditures were not directly for the children's benefit and that some were prior to the separation. "[A]s we have often noted, 'the fact finder . . . ha[s] the advantage of hearing testimony of witnesses and [can] directly judge their credibility.'" *Id.* ¶ 19, 866 N.W.2d at 556 (alterations in original) (quoting *Orth v. Stoebner & Permann Constr., Inc.*, 2006 S.D. 99, ¶ 77, 724 N.W.2d 586, 602). Dunham has failed to show a clear error in the circuit court's findings, and we find no abuse of discretion in the circuit court's rejection of the in-kind expenditures for which Dunham sought credit.

c. *Reimbursement for parochial tuition expenses.*

[¶36.] Dunham argues that the circuit court abused its discretion in deviating from the child support schedule under SDCL 25-7-6.2 by ordering him to pay half of the children's future parochial school tuition costs and reimburse Sabers for the past tuition to which he did not contribute. He relies on *Roseth v. Roseth*, 2013 S.D. 27, ¶ 16, 829 N.W.2d 136, 143, to argue that because the parties did not have a

formal written agreement binding him to pay tuition expenses, he is not obligated to provide for the additional costs incurred for the tuition expenses.

[¶37.]     Under SDCL 25-7-6.1, parents are jointly liable for the necessary education expenses of their children.  The court may deviate from the child support schedule in SDCL 25-7-6.2 "upon the entry of specific findings" for "[a]ny necessary education . . . of the child[.]"  SDCL 25-7-6.10.  Contrary to Dunham's assertion, SDCL 25-7-6.1 and SDCL 25-7-6.10 do not require the parents to enter into a formal written agreement for the court to order child support for necessary education expenses.  Further, the Legislature has not defined the types of expenses that are "necessary" education expenses.  Rather, SDCL 25-7-6.10(3) provides that "[a]ny necessary education or . . . needs of the child" may support an upward deviation in child support.  Thus, the circuit court has discretion, considering the circumstances of each case, to determine whether an upward deviation from the child support schedule is appropriate for education expenses the court finds to be necessary.

[¶38.]     The evidence is undisputed that the children attended parochial schools since elementary school.  Both parents had the means to pay school tuition and had been fully supportive of the children's parochial schooling since the start.  Further, Dunham agreed to keep the children in parochial school after the separation and paid tuition for the 2014–2015 school year.  The circuit court made specific findings as required by SDCL 25-7-6.10 to support its upward deviation from the child support schedule and did not abuse its discretion in determining the children's parochial school tuition was a necessary education expense.

### 3.     *Classification and division of the marital property.*

[¶39.]      "South Dakota is an all property state, meaning all property of the divorcing parties is subject to equitable division by the circuit court, regardless of title or origin." *Osdoba v. Kelley-Osdoba*, 2018 S.D. 43, ¶ 18, 913 N.W.2d 496, 502 (quoting *Nickles v. Nickles*, 2015 S.D. 40, ¶ 32, 865 N.W.2d 142, 153). "Before dividing property, the court must classify it as marital or nonmarital." *Ahrendt v. Chamberlain*, 2018 S.D. 31, ¶ 8, 910 N.W.2d 913, 918. "[T]he principal rule for analyzing a discrete claim of separate property provides that '[o]nly where one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support, should a court set it aside as "non-marital" property.'" *Field v. Field*, 2020 S.D. 51, ¶ 18, 949 N.W.2d 221, 225 (citation omitted). "The court has broad discretion in classifying property as marital or nonmarital." *Ahrendt*, 2018 S.D. 31, ¶ 10, 910 N.W.2d at 918.

[¶40.]      In "divid[ing] property in divorce proceedings, 'there is no rigid formula that must be followed, nor any fixed percentage to which either party is entitled.'" *Osdoba*, 2018 S.D. 43, ¶ 19, 913 N.W.2d at 502 (citation omitted). "[T]he law does not require perfection that would approach mathematical certainty." *Id.* ¶ 18, 913 N.W.2d at 502 (citation omitted). The court should consider the following factors when classifying and dividing property:

> (1) the duration of the marriage; (2) the value of the property owned by the parties; (3) the ages of the parties; (4) the health of the parties; (5) the competency of the parties to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets.

*Ahrendt*, 2018 S.D. 31, ¶ 10, 910 N.W.2d at 918 (quoting *Terca v. Terca*, 2008 S.D. 99, ¶ 20, 757 N.W.2d 319, 325).

[¶41.] Dunham and Sabers both challenge the circuit court's classification and division of marital property on appeal. Dunham objects to the circuit court's classification of certain personal property including the 2001 Ford F-150, 1969 Firebird, and 2008 Yukon. He also claims that the Dakota Law and Fuller & Sabers buy-out funds spent by Sabers during the separation should have been treated as marital property for which he should have received a credit in the property division. Dunham also argues the life insurance proceeds, from his father, that he invested into ALDC and Milestone after the separation should have been treated as non-marital property. Sabers asserts that the circuit court abused its discretion in dividing the property 50/50 because she made a greater economic contribution to the accumulation of the parties' assets. She also argues that the circuit court abused its discretion in classifying interests held by the Estate in Tatar Quincey, Dunham Equity Management, and Dunham Partnership as non-marital property.

> a. *Ford F-150, 1969 Firebird, and 2008 Yukon.*

[¶42.] Dunham argues that the Ford F-150 and the Firebird were gifts to him from Donald and that Sabers made no contribution to the acquisition and maintenance of the vehicles. "[G]ifted or inherited property is not automatically deemed separate and 'ipso facto excluded from consideration in the overall division of property.'" *Field*, 2020 S.D. 51, ¶ 17, 949 N.W.2d at 224–25 (quoting *Anderson v. Anderson*, 2015 S.D. 28, ¶ 7, 864 N.W.2d 10, 14). To determine "whether to include

the inherited or gifted property, a circuit court may consider 'other evidence . . . including the origin and treatment of . . . property and the direct or indirect contributions of each party to the accumulation and maintenance of the property.'" *Id.* ¶ 17, 949 N.W.2d at 225 (quoting *Halbersma v. Halbersma*, 2009 S.D. 98, ¶ 12, 775 N.W.2d 210, 215). The record supports the circuit court's inclusion of the Ford F-150 and Firebird in the marital estate. The Ford F-150 and Firebird were gifted during the marriage by transferring the titles to Dunham, but Sabers testified, without dispute, that she paid for registration, insurance, and maintenance on both vehicles. As to the Yukon, the record shows that Q.S.D. has driven it for several years and the parties have treated it as his vehicle. The circuit court did not abuse its discretion in its classification of the vehicles.

> b.    *Non-marital property credits.*

[¶43.]    Dunham asserts that the circuit court abused its discretion by applying different standards to award Sabers an offset for her Belmont House and SDRS retirement accounts while denying Dunham a similar offset for the life insurance proceeds that he used to invest into Milestone and ALDC after the separation. In Dunham's view, the court should have treated these post-separation investments as separate property and granted him an offset for the use of these proceeds because Sabers made no contribution to the acquisition of the life insurance proceeds or the use of those proceeds post-separation.[7] Dunham argues

---

7.    Dunham argues that the circuit court also abused its discretion in not giving him an offset for his "gifted" 20% interest in Dunham Partnership because he received the interest from his father in 1989. However, the 20% interest of

(continued . . .)

that there is no meaningful distinction between the credit the court gave Sabers for post-separation retirement contributions the court found Dunham made no contribution to, and the post-separation contributions he made from the life insurance proceeds that Sabers made no contribution toward.

[¶44.]	Sabers contends that the court properly deemed the post-separation portion of her retirement accounts non-marital because Dunham did not contribute to the retirement funds. She also asserts that the circuit court properly granted her an offset in the valuation of the Marital Home because she owned the Belmont House before the parties began dating. Sabers also argues that the circuit court did not abuse its discretion in treating the life insurance proceeds as marital property because she had a need for support and she contributed to Dunham's business ventures by paying the family living expenses and caring for the children, which allowed Dunham to pursue business opportunities.

[¶45.]	We find no clear error in the court's findings that Dunham made less than de minimis contributions to the Belmont House and Sabers's contributions to her retirement accounts. *See Conti v. Conti*, 2021 S.D. 62, ¶ 31, 967 N.W.2d 10, 18 ("[W]e review a circuit court's finding that one spouse made a de minimis contribution for clear error."). Sabers owned the Belmont House prior to the marriage, made all the mortgage payments and other expenses for the home, owned a premarital bank account, and applied those proceeds as a down payment on the

---

(. . . continued)

Dunham Partnership was held by QAZ since at least 2008 and Dunham presented evidence that QAZ was marital property.

Marital Home.[8]  Similarly, the post-separation contributions Sabers made to the retirement accounts were also properly excluded.  Dunham makes no claim that either asset was necessary for his support, and the court acted within its discretion to exclude these items from the marital estate.

[¶46.]        We also find no abuse of discretion in the circuit court's treatment of the life insurance proceeds from Dunham's father as marital property.  Life insurance proceeds and inherited property may be considered marital property.  *See Taylor v. Taylor*, 2019 S.D. 27, ¶ 26, 928 N.W.2d 458, 468.  "In evaluating the seven principal factors listed above, a circuit court may consider other evidence to determine whether inherited or gifted property should be excluded from the marital estate, including the origin and treatment of inherited or gifted property and the direct or indirect contributions of each party to the accumulation and maintenance of the property."  *Halbersma*, 2009 S.D. 98, ¶ 12, 775 N.W.2d at 215.  *See Terca*, 2008 S.D. 99, ¶ 23, 757 N.W.2d at 325 (finding the fact that inherited property was received nine years into an eighteen-year marriage supported its inclusion in the marital estate where spouse made indirect contributions during the nine years).  Further, property should only be excluded as non-marital when "one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support[.]"  *Field*, 2020 S.D. 51, ¶ 18, 949 N.W.2d at 225 (citing *Novak*, 2006 S.D. 34, ¶ 5, 713 N.W.2d at 552–53).

---

8.    Although Dunham testified that he made non-economic contributions to the household during the first two years of the marriage, before the Belmont House was sold, Sabers disputed this testimony and such factual determinations are for the circuit court, not this Court, on appeal.

[¶47.] Dunham does not dispute that he received the life insurance proceeds before the parties separated in 2013. In evaluating Dunham's requested offset for the life insurance proceeds, the circuit court found that Sabers contributed substantially to the accumulation of marital property, and that this support by Sabers contributed indirectly to Dunham's ability to invest the life insurance proceeds in ALDC and Milestone after the separation. The circuit court found this contribution was more than de minimis, despite the close proximity in time between the receipt of the life insurance proceeds and the separation. In *Terca*, we affirmed the circuit court's classification of inherited property of one spouse as marital property when the evidence showed that the other spouse had made indirect contributions as a "housewife and mother" to the maintenance of property. *Id.* ¶¶ 13, 25, 757 N.W.2d at 323, 326. "An indirect contribution can occur when one spouse's work efforts allows [sic] the other spouse to maintain inherited property separately and avoid commingling assets that otherwise would be required for the support and maintenance of the family." *Id.* ¶ 25.

[¶48.] Dunham acknowledged that Sabers was the breadwinner of the family, and the record shows that Sabers provided most of the family's income during the marriage. Sabers paid the parties' living expenses and mortgage on the Marital Home and contributed as both a housewife and mother in caring for the children. These contributions by Sabers permitted Dunham to maintain the life insurance proceeds separately, albeit for a short period of time, and avoid comingling the funds to support the family. Additionally, for most of the eight-year separation,

Sabers continued to exclusively provide for the living expenses for herself and the children, while Dunham provided little financial support.

[¶49.] In applying the abuse of discretion standard for classifying and dividing marital property, "we do not inquire whether we would have made the same decision. Instead, we decide only whether the circuit court could reasonably reach the conclusion it did in view of the applicable law and the circumstances of the case." *Maxner v. Maxner*, 2007 S.D. 30, ¶ 12, 730 N.W.2d 619, 622. Having concluded there was no clear error in the circuit court's findings that Sabers made more than de minimis indirect contributions to the life insurance proceeds, it was within the circuit court's discretion to deny the offset for them.

[¶50.] Dunham also claims that the circuit court abused its discretion in not including the Dakota Law and Fuller & Sabers buy-out funds in the property division. The circuit court placed no value on either of the Dakota Law or Fuller & Sabers buy-out funds and excluded them from the property division after finding the funds were not in existence at the time of trial and were spent in good faith on living expenses for Sabers and the children.

[¶51.] While the finding that Sabers used the buy-out funds in good faith, on living expenses, may support a conclusion that she did not violate SDCL 25-4-33.1, it does not resolve the question of whether the buy-out funds were marital property. In particular, the circuit court failed to consider whether Dunham made any contribution to the accumulation of the buy-out funds. Further, the circuit court failed to apply the factors for determining whether property should be treated as marital. *See Ahrendt*, 2018 S.D. 31, ¶ 10, 910 N.W.2d at 918.

[¶52.] While Sabers made significant contributions toward the accumulation of these funds, there was evidence that Dunham contributed to the design and development of the Dakota Law building. Dunham was a 25% owner of Dakota Law until it was sold. Dunham also testified that he supported Sabers in her legal career and in her efforts to seek a judicial position. "[O]nly where one spouse has made no or de minimis contributions to the acquisition or maintenance of an item of property and has no need for support[ ] should a court set it aside as [nonmarital] property." *Conti*, 2021 S.D. 62, ¶ 31, 967 N.W.2d at 18 (alterations in original) (quoting *Ahrendt*, 2018 S.D. 31, ¶ 10, 910 N.W.2d at 918). Dunham made no claim that he needed these funds for support but he claimed that he made more than a de minimis contribution to the buy-out funds.

[¶53.] Sabers relies on *Anderson* to argue that because the buy-out funds were not in existence at the time of the trial, the circuit court did not abuse its discretion by not including the funds in the marital estate. *Anderson*, 2015 S.D. 28, ¶ 12, 864 N.W.2d at 16. However, *Anderson* is inapposite. In *Anderson*, the wife took funds out of the parties' bank account upon separation, and the husband had exclusive use of the parties' farm and marital household during the separation. *Id.* The circuit "court found that '[b]oth parties used marital assets throughout their period of separation[,]'" and declined to include bank account funds in the marital estate. *Id.* Here, the court made no findings that Dunham used any marital property during the separation. Rather, Sabers and the children lived in the Marital Home and Dunham transferred title to the Marital Home, the parties'

vehicles, and the joint savings account to Sabers in 2013 when the parties separated.

[¶54.] Because the circuit court's findings were insufficient to support its conclusion that the buy-out funds should be excluded from the marital estate, the court abused its discretion in setting aside the property as non-marital. On remand, we direct the circuit court to apply the appropriate factors identified above and enter findings specifically addressing whether the Dakota Law and Fuller & Sabers buy-out funds should be classified as marital or non-marital property.

c.     50/50 Marital Property Division.

[¶55.] By notice of review, Sabers argues that the circuit court abused its discretion in dividing the marital estate 50/50. She asserts that the circuit court improperly weighed the factors for property division and failed to consider that she primarily contributed to the accumulation of the parties' assets and that Dunham received the income-producing assets.

[¶56.] In dividing the property 50/50, the circuit court properly analyzed the property division factors and found that the parties had been married for approximately eighteen years, both were in reasonably good health, and both were competent to earn a living. The circuit court further found that both parties contributed to the accumulation of the marital property, as Dunham contributed income-producing business assets while Sabers paid for most of the family's expenses. Further, the court did not find that either party was in need of support.

[¶57.] Sabers asserts that the circuit court should have considered that it was Dunham's contemptuous behavior that made the division and valuation of assets

difficult. The circuit court may "consider a party's 'lack of candor . . . and lack of cooperation' in the court's proceedings" as an additional factor when dividing property. *Taylor*, 2019 S.D. 27, ¶ 29, 928 N.W.2d at 468 (quoting *Giesen v. Giesen*, 2018 S.D. 36, ¶ 31, 911 N.W.2d 750, 758). The circuit court found that Dunham's actions during discovery unreasonably prolonged the litigation and considered this finding in awarding attorney fees to Sabers. However, the court did not enter any findings that Dunham's resistance to financial inquiries concerning the Estate caused the court to question the value of marital assets, or that the conduct was otherwise relevant to the division of property. *See id.* ¶ 31, 928 N.W.2d at 469 (finding that a husband's lack of disclosure in discovery and court orders justified a valuation of property that favored the wife). Based on the record, we cannot say the court abused its discretion when the court examined all the applicable factors in conducting the division of property between the parties.

### d. Tatar Quincey, Dunham Equity Management, and Dunham Partnership.

[¶58.] Sabers also argues, by notice of review, that the circuit court should have classified the Estate's 92% interest in Tatar Quincey, 20% interest in Dunham Equity Management, and 40% interest in Dunham Partnership as marital property. The circuit court classified these interests as non-marital property and excluded them from the marital estate.

[¶59.] Regarding the Estate's interest in Tatar Quincey, Sabers asserts that the circuit court should have included the entirety of Tatar Quincey in the valuation of the marital estate because Dunham purchased a 100% interest in Tatar Quincey through ALDC and then impermissibly transferred a 92% interest into the Estate to

hide the marital asset. Dunham responds that the circuit court properly excluded the 92% interest in Tatar Quincey because the Estate obtained financing to purchase the interest.

[¶60.] While the timing of the transaction and Dunham's lack of transparency are concerning, there is no evidence that Dunham used marital funds to obtain the Estate's 92% interest in Tatar Quincey. Dunham's testimony that the Estate borrowed $1.4 million against future revenue to obtain Tatar Quincey supported the circuit court's conclusion that the asset was non-marital. The record also reflects that the Estate, not Dunham personally, obtained the $1.4 million loan and that the liability remained with the Estate. Moreover, Sabers failed to provide any proof that Dunham used marital funds for this purchase or that Sabers made any contribution to the purchase.

[¶61.] Regarding both Dunham Equity Management and Dunham Partnership, Sabers asserts that Dunham used marital funds totaling $661,570 to purchase his brothers' interests for the Estate and those interests should have been valued in the marital estate. Dunham argues that the court properly excluded Dunham Equity Management and Dunham Partnership because these assets were owned by the Estate, the purchases were made post-separation, and none of the funds used to purchase his brothers' interests came from marital assets.

[¶62.] While the sources of the funds Dunham used to purchase his brothers' interests in Dunham Partnership and Dunham Equity Management are not fully clear, Dunham facilitated these purchases for the Estate more than three years after the separation. Further, there is no evidence that Dunham used marital

assets to facilitate the purchase of these assets. Rather, the evidence is undisputed that Sabers controlled essentially all the marital assets after the separation, and Dunham had no access to marital funds during this time. Sabers wanted nothing to do with the Dunham businesses and she presented no evidence that she made any contribution toward Dunham's purchase of his brothers' interests. Based on this record, we cannot say that the circuit court abused its discretion in determining that Dunham Partnership and Dunham Equity Management was an asset of the Estate and, therefore, non-marital property.

### 4. *Valuation of the marital property.*

[¶63.]     Dunham challenges the circuit court's valuations of the Wells Fargo account and Dunham's interest in Milestone. This Court does "not attempt to place valuations on the assets because that is a task for the trial court as the trier of fact." *Giesen*, 2018 S.D. 36, ¶ 26, 911 N.W.2d at 757 (citation omitted). Rather, we "will interfere with the circuit court's valuation when the valuation is clearly erroneous." *Id.* Under a clearly erroneous review, "this Court 'will overturn the trial court's findings of fact on appeal only when a complete review of the evidence leaves [this] Court with a definite and firm conviction that a mistake has been made.'" *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 15, 826 N.W.2d 627, 633 (alteration in original) (citation omitted). The circuit court's valuation of assets does not have to be exact. However, it "must fall 'within a reasonable range of figures,' based on the evidence presented at trial." *Conti*, 2021 S.D. 62, ¶ 26, 967 N.W.2d at 17 (internal quotation marks and citation omitted). "The trial court's findings of fact are presumptively correct and

the burden is upon appellant to show error." *Taylor*, 2019 S.D. 27, ¶ 15, 928 N.W.2d at 465 (quoting *Grode v. Grode*, 1996 S.D. 15, ¶ 19, 534 N.W.2d 795, 801).

   a.   *Sabers's Wells Fargo bank account.*

[¶64.]      Dunham argues that the circuit court accepted self-serving testimony from Sabers in valuing the Wells Fargo bank account at zero dollars, despite the most recent statement prior to trial showing a balance in the account. He contrasts the court's treatment of her testimony with the court requiring him to provide receipts for all of his in-kind contributions for the children. At the time of trial, Sabers explained that she depleted the funds from the Wells Fargo account every month to pay for living expenses and credit card debt. The circuit court found this testimony credible and valued the Wells Fargo bank account at zero dollars. "[W]e must defer to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony." *Parsley v. Parsley*, 2007 S.D. 58, ¶ 15, 734 N.W.2d 813, 817 (citation omitted). Based on the record, the court did not clearly err in valuing the Wells Fargo bank account.

   b.   *Milestone Valuation.*

[¶65.]      Dunham argues that the circuit court erred in finding that he owned 100% of Milestone and in failing to subtract the rent he owed to Milestone. However, Dunham's tax returns from 2013 to 2018 represent that he owned 100% of Milestone. Dunham also admitted in discovery that he was the 100% owner of Milestone. In view of this evidence, the circuit court found that the testimony from Dunham and Karen that they each owned a 50% interest in Milestone was not credible. The circuit court made these credibility determinations, "and it is not an

appellate court's place to interfere." *Grode*, 1996 S.D. 15, ¶ 21, 543 N.W.2d at 801. Based upon the court's finding that Dunham owned a 100% interest in Milestone, the court was also within its discretion in refusing to reduce the value of Milestone by $40,907 for the rent he claimed to owe to Milestone.

### 5. The court's consideration of Dunham's interest in the Trust when determining his financial condition.

[¶66.] Dunham argues that the circuit court abused its discretion in considering his interest in the Trust to determine his financial condition because he only has a discretionary interest in the Trust. A discretionary interest in a trust may not be considered in the division of marital property under SDCL 55-1-30. However, it is well-established that non-marital assets may be considered in determining a party's financial condition. *See Billion v. Billion*, 1996 S.D. 101, ¶ 37, 553 N.W.2d 226, 234 (finding that the circuit court erred when it did not consider non-marital assets in determining a party's need for support and financial condition).

[¶67.] The circuit court did not include Dunham's discretionary interest in the marital estate and did not order Dunham to use Trust funds to satisfy his obligations. Rather, the court merely considered the likelihood that Dunham would receive distributions from the Trust as the discretionary beneficiary to determine whether Dunham had the ability to fulfill his monetary obligations under the court's order.[9]

---

9. During oral argument, Dunham claimed for the first time on appeal that the circuit court abused its discretion by not establishing a structured payment plan over time to pay the large judgment entered by the circuit court.

(continued . . .)

### 6.     *Award of attorney fees.*

[¶68.]     Both parties argue that the circuit court abused its discretion by ordering Dunham to pay Sabers $50,000 in attorney fees.  Dunham contends the court erred by awarding any fees, and Sabers argues the court should have awarded her more attorney fees.  A circuit court may award attorney fees in a divorce action.  SDCL 15-17-38.  We apply a two-step analysis:

> First, the court must determine what constitutes a reasonable attorney's fee.  This requires consideration of: (1) the amount and value of the property involved; (2) the intricacy and importance of the litigation; (3) the labor and time involved; (4) the skill required to draw the pleadings and try the case; (5) the discovery utilized; (6) whether there were complicated legal problems; (7) the time required for the trial; and (8) whether briefs were required.  Second, it must determine the necessity for such fee.  That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party.  This requires consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

*Evens v. Evens*, 2020 S.D. 62, ¶ 44, 951 N.W.2d 268, 282 (citation omitted).

[¶69.]     "We will not overturn the trial court's award of attorney fees absent an abuse of discretion."  *Grode*, 1996 S.D. 15, ¶ 39, 543 N.W.2d at 804.  The circuit court entered detailed findings of fact and conclusions of law considering the appropriate factors that supported the award of $50,000 in attorney fees to Sabers.

---

(. . . continued)

Dunham indicated in his post-trial objection to the circuit court that he would be unable to pay a lump sum amount, but he did not request, or present, a proposed payment plan for the court's consideration.  We have stated that "[a] party may not raise an issue for the first time on appeal, especially in a reply brief when the other party does not have the opportunity to answer." *Ellingson v. Ammann*, 2013 S.D. 32, ¶ 10, 830 N.W.2d 99, 102 (citation omitted).  Even if the argument has not been waived, we find no abuse of discretion by the circuit court in not ordering a payment plan on this record.

The circuit court found that each party owns substantial assets, that Sabers was awarded a cash equalization payment of $262,902 but Dunham was awarded the income-producing assets, that each party earns a substantial income, and that their earning capacities are nearly equal. The court also analyzed the work and time spent by the attorneys throughout the litigation and found that Dunham unreasonably prolonged the divorce litigation. The circuit court did not abuse its discretion in awarding Sabers $50,000 for attorney fees.[10]

### 7. Annual exchange of tax returns.

[¶70.] Dunham argues the circuit court's order requiring the parties to exchange tax returns every year violates his right to confidentiality, improperly subjects him to frequent child support reviews, and only fosters continued litigation in the case. Sabers asserts that Dunham has no right to privacy in his tax returns for purposes of calculating child support, and, if he did, the children's interest in obtaining support from their father supersedes his privacy interests.

[¶71.] The circuit court has "the authority to require periodic adjustments in the support." SDCL 25-7-6.11. SDCL 25-7A-22(1) provides that a party may only file a petition to modify a support order within three years of the date of the order upon a showing of "a substantial change in circumstances." The current child support order was entered as part of the judgment and decree of divorce on February 6, 2021. However, SDCL 25-7-6.13, was amended during the 2022 legislative session to provide that a court is authorized to modify "[a]ll orders for

---

10. Both parties moved for appellate attorney fees pursuant to SDCL 15-26A-87.3 and attached itemized statements of the legal services rendered. We decline to award either party appellate attorney fees.

support entered and in effect prior to July 1, 2022, . . . in accordance with this chapter without requiring a showing of a change in circumstances from the entry of the order."[11]

[¶72.]    Dunham failed to pay child support until the entry of the 2018 support order and withheld financial information during the case necessary to enable the court to determine Dunham's support obligation.  The calculation of Dunham's child support obligation is further complicated because Dunham is self-employed with fluctuating annual income.  Dunham's current child support obligation is based on outdated information as it reflects his income from 2018 and earlier because he resisted disclosing his financial information at the time of trial.  Given the court's authority to periodically modify a child support order and the circumstances of the case, the circuit court may very well have had the discretion to order the parties to exchange tax returns until Z.S.D. is no longer eligible for support.

[¶73.]    However, as Dunham correctly observes, the court entered the order without a request from either party or without any apparent consideration of the need to protect any sensitive financial information or other confidential information contained in the tax returns.  Before sua sponte ordering the production of the parties' tax returns post-divorce, the court should have sought input from the parties on the relevant considerations for a protective order under SDCL 15-6-26(c) and the need for a protective order for some or all of the information contained in

---

11.    The 2022 amendment to SDCL 25-7-6.13 was in response to the adjustments to the child support guidelines in SDCL 25-7-6.2 that were recommended to the Legislature by the 2021 South Dakota Commission on Child Support, as part of the quadrennial review of the child support guidelines required by SDCL 25-7-6.12.

the tax returns. Therefore, we vacate the order and remand for further proceedings on this issue consistent with this opinion.

### 8. *Failure to grant Sabers a divorce on the grounds of extreme cruelty.*

[¶74.] The circuit court granted the parties a divorce pursuant to SDCL 25-4-2(7) on the grounds of irreconcilable differences. Sabers argues that the circuit court should have granted her a divorce on the grounds of extreme cruelty under SDCL 25-4-2(2) based on Dunham's anger issues, emotional and physical abuse of the children, and emotional abuse of her. SDCL 25-4-2 permits a court to grant a divorce on the grounds of extreme cruelty, which is defined as "the infliction of grievous bodily injury or grievous mental suffering upon the other, by one party to the marriage." SDCL 25-4-4.

[¶75.] The court fully considered the evidence and found that the parties had mutual conflict for many years that led to the irreparable breakdown of the marriage. The record supports this determination, and we find no clear error in the court's decision to grant a divorce on the grounds of irreconcilable differences rather than extreme cruelty. *See Evens*, 2020 S.D. 62, ¶ 20, 951 N.W.2d at 276 ("We review a circuit court's determination of the grounds for divorce for clear error.").

[¶76.] Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

[¶77.] KERN and MYREN, Justices, and DAY and CONNOLLY, Circuit Court Judges, concur.

[¶78.] DAY, Circuit Court Judge, sitting for SALTER, Justice, who deemed himself disqualified and did not participate.

[¶79.]        CONNOLLY, Circuit Court Judge, sitting for DEVANEY, Justice, who deemed herself disqualified and did not participate.