#30321-a-PJD
**2024 S.D. 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

REGINA GOEDEN,                                    Plaintiff and Appellee,

    v.

WAYNE G. GOEDEN,                                  Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

JEFFREY R. BECK
Sioux Falls, South Dakota                         Attorney for defendant and
                                                  appellant.


SCOTT D. KADING
LAURA T. BEATCH of
Kading, Kunstle & Goodhope, LLP
Sioux Falls, South Dakota                         Attorneys for plaintiff and
                                                  appellee.

* * * *

CONSIDERED ON BRIEFS
MARCH 19, 2024
OPINION FILED **08/28/24**

#30321

DEVANEY, Justice

[¶1.]     In this divorce proceeding, Wayne Goeden challenges the circuit court's determination that the parties' premarital agreement is void and unenforceable and further challenges the court's rulings related to the valuation and division of marital property. Wayne also claims the court erred in its treatment of his veterans' disability benefits and that it improperly granted Regina Goeden a divorce based on extreme cruelty. We affirm.

**Factual and Procedural Background**

[¶2.]     Regina and Wayne began dating in approximately 2013. Both had been married previously and have adult children from prior relationships. Regina was employed full time as an analyst at Edward Jones, and Wayne was employed full time as an IT project manager with Midco. At some point in the relationship, they began living together in a home owned by Wayne, and in 2015, they became engaged. However, during the summer of 2016, Wayne physically assaulted Regina, and she ended the relationship. Regina called law enforcement about the abuse after her daughter and son-in-law saw bruises on Regina's body, and Wayne was charged with domestic assault. Ultimately, Wayne pled guilty to disorderly conduct and completed a six-month anger management program.

[¶3.]     In early 2017, Regina and Wayne reconciled, and Regina moved back into Wayne's home. They again became engaged, and at some point, the parties discussed the topic of executing a premarital agreement. According to Regina, Wayne did not mention wanting a premarital agreement before the first or current proposal. She claimed that he brought it up for the first time after they set a June

-1-

2017 wedding date. She further claimed that she felt pressured to agree because she was living with him, had sold her vehicle and furniture at Wayne's direction, and was dependent on him. Wayne, however, claimed that the premarital agreement was Regina's idea because he expressed reluctance to marry her in light of how his previous marriage had ended and because Regina had lied about him abusing her in 2016. It is undisputed that Wayne printed a premarital agreement (Agreement) template from the internet and that Regina signed it in front of a notary nine days before their June 22, 2017 wedding.

[¶4.] The Agreement provides that property owned solely by either party would be treated as separate property unless the property is shared property or there is proof of shared legal ownership. It further provides that jointly acquired or jointly held property, however or whenever acquired, will be treated as shared property. The Agreement states that upon dissolution of their marriage, neither party would make a claim to the other's retirement account and that Wayne would receive the $189,000 in equity he brought into the marriage and Regina would receive the $5,000 in cash she brought into the marriage. Thereafter, "all remaining property will be valued and divided equally regardless of either parties [sic] salary or contribution to the marriage."

[¶5.] The Agreement refers to and includes separate asset disclosure statements (Schedules A1 and A2) for Wayne and Regina. Under the provisions outlined above, the property in these schedules is deemed to be the separate property of each party. Regina testified that Wayne completed her schedule and listed $15,000 in premarital assets, representing her personal property and $5,000

cash on hand. But according to Regina, she did not have $5,000 cash on hand, and when she asked Wayne about this amount, he told her he included it to do her a favor. Wayne's schedule identified $189,000 in assets comprising his home equity, a pickup, a car, a boat, a motorcycle, a flatbed trailer, miscellaneous items, personal property, and cash on hand. Neither party's schedule identified their respective retirement accounts or balances. Wayne's schedule also did not disclose his Health Savings Account (HSA) or personal bank account. At the time of their marriage in June 2017, Wayne's retirement account was valued at approximately $95,500, and he had $8,710 in his HSA and $14,424 in his bank account. Regina's retirement account was valued at $14,256.

[¶6.]     Shortly after the couple married, Wayne sold his home and placed the proceeds, $87,000, in his personal Wells Fargo account. Wayne and Regina purchased a new home and placed it in joint tenancy. They used $60,000 from Wayne's proceeds of the sale of his home for the down payment on the new home. In May 2018, Wayne added Regina to his personal Wells Fargo account as an authorized user, and she began depositing her paychecks into that account. The parties then used that account to pay for marital expenses, though Wayne argued that Regina spent more than she contributed and that he personally paid for a majority of the parties' expenses.

[¶7.]     Wayne is a veteran, and after the marriage, he applied for and was approved to receive disability payments for hearing loss and inner ear dysfunction caused by his premarital military service. After approval, he received an initial lump-sum payment of $39,676.02 in December 2018. He deposited that payment in

the joint Wells Fargo account. However, he claimed that he used $37,000 of that amount to finish a basement remodeling project in their home. He further claimed that he deposited his $3,100 monthly disability benefit in the joint Wells Fargo account, but he used a majority of this amount each month to make payments toward the principal on the couple's mortgage. He alleged that he made $53,250 in payments toward the mortgage principal using his disability benefits.

[¶8.] In February 2021, Wayne opened a new Wells Fargo account in his name only and transferred $18,000 from the joint account into this personal account. He claimed that he opened this new account because he was concerned with how Regina was spending money, including money that she was giving to her brother. According to Wayne, Regina's brother abused substances and Regina enabled him, which "caused an insurmountable obstacle in the marriage." After opening his separate account, Wayne began depositing his monthly disability benefits into this account; however, he continued to deposit his paychecks into the joint account.

[¶9.] In May 2021, Wayne and Regina began seeing a counselor. Wayne claimed that the counselor gave them specific issues to work on to improve their relationship, including better communication and trust, having sex more often, and Regina having better boundaries with her brother. Regina did not recall having a specific conversation with their counselor about sex; however, she claimed that if they did not have sex every other day, Wayne's "mood would not be good[.]" At trial, a recording of Wayne screaming at Regina on May 14, 2021, was played for the court. Regina testified that she recorded the exchange to show Wayne at a later

time how he talks to her. On the recording, Wayne can be heard berating Regina, seemingly at the top of his lungs, for not having sex with him this week and that he "made crystal clear how this was unacceptable." As he repeated his scolding that "this is unacceptable," Regina can be heard quietly apologizing.

[¶10.] In September 2021, Wayne and Regina separated, and on September 27, Regina filed for divorce, alleging irreconcilable differences and extreme cruelty as grounds. Wayne answered and counterclaimed for a divorce on the same grounds. Wayne also sought enforcement of the Agreement as it relates to the division of the parties' property and debts.

[¶11.] Although Wayne and Regina separated, they continued to live together in the marital home. Shortly thereafter, Regina obtained a temporary protection order against Wayne based on allegations of domestic abuse and Wayne moved out of the house. The circuit court denied Regina a permanent protection order at a December 2021 hearing because of insufficient evidence to sustain a finding of domestic abuse, and after a hearing in January 2022, the court granted Wayne's motion for exclusive possession of the marital home. The court also ordered that he be responsible for all financial obligations, maintenance, and upkeep for the marital home. Regina then moved out of the home and lived with family until she obtained a rental home.

[¶12.] The circuit court held a three-day divorce trial in January 2023, during which Regina, her daughter, an appraiser, and Wayne testified. Following the trial, the court issued a memorandum decision and the parties submitted proposed findings of fact and conclusions of law. The court thereafter issued findings of fact

and conclusions of law, which incorporated its memorandum decision, and issued a judgment and decree of divorce.

[¶13.] In its decision, the circuit court made observations about Wayne's and Regina's personal characteristics and "found Regina to be the more credible witness" because her "demeanor and general testimony gave the [c]ourt confidence in her integrity as a witness[.]" The court therefore indicated that "to the extent that her version of an event varied from that given by Wayne, the [c]ourt accepts Regina's testimony as correct." The court noted an "area of divergent testimony" being "the genesis of the Prenuptial Agreement entered into evidence[.]" In its later analysis of the law governing premarital agreements, the court voided the Agreement, determining based on the totality of the circumstances surrounding its execution that Regina did not execute it voluntarily and that it was unconscionable.

[¶14.] As part of its classification and division of the parties' property, the circuit court noted that the parties had been married for five and a half years, that no children were born during the marriage, and that at the time of trial, Regina was 52 and Wayne was 55. The court also noted that Regina has an associate degree in paralegal studies but has not worked in that field, and Wayne has three degrees—associate, bachelor, and masters. The court found that while both suffer from certain health conditions, "[n]either parties' condition adversely affects their employability." However, the court determined that "Wayne's capacity to earn an income is twice Regina's, such that hers is marginal and his is comfortable" because Wayne receives approximately $9,000 in net monthly income, including his disability benefits, while Regina receives approximately $2,750 per month.

[¶15.] After stating that Wayne and Regina's "marriage was intended to be a partnership and the accumulation of their assets was the fruit of those joint efforts, in which each party contributed in earnest[,]" the circuit court found that they contributed equally to their accumulation of assets by working full time and contributing their earnings to the marriage. The court further found that both parties worked within the home to keep it clean, maintained, and improved. The court accepted Regina's expert's testimony that the fair market value of the home is $589,000 rather than Wayne's evidence that the City of Sioux Falls assessed the home in November 2022 at $499,000.

[¶16.] The circuit court awarded Wayne the marital home and gave him a $60,000 credit for the amount he invested from the proceeds of the sale of his separately owned home for the down payment. The court did not award Wayne the $100,000 credit he claimed for labor he provided toward the basement remodel. The court also rejected Wayne's request for a $29,976 credit for anticipated realtor and closing costs, finding no evidence that Wayne intended to sell the marital home.

[¶17.] The circuit court valued Regina's Kia Optima at $14,500 and Wayne's Kia Telluride at $38,000, minus a $20,000 loan, and awarded each party their respective vehicles. The court, however, noted that as a result, Wayne received $3,500 more in equity with respect to the marital vehicles than Regina. The court also noted, after awarding the parties their respective bank account balances, that Wayne received $4,000 more in equity in these accounts than Regina. In regard to the parties' retirement accounts, the court did not include the premarital values in

the marital estate; rather, the court considered only the growth in value during the marriage, $35,000 for Regina and $155,000 for Wayne.

[¶18.]     While the parties were separated and a temporary restraining order (TRO) was in place with respect to their finances, Wayne used $15,900 from his HSA to prepay for an elective eye surgery.[1]  He claimed that he had received permission in a prior hearing before a different judge to use his HSA funds for this procedure.  At the time of trial, the HSA contained only $1,490.  Regina argued that Wayne intentionally depleted the value of this marital asset.  The circuit court found that Wayne violated the TRO by using $15,900 from his HSA to prepay for the elective eye surgery.  The court found that the HSA had a balance of $8,700 prior to the marriage, and after adding back $15,900 to the $1,490 account balance at trial and deducting the $8,700 premarital sum, the court attributed the remaining $8,680 to the value of Wayne's share of the marital estate.

[¶19.]     The circuit court also found that Wayne violated the TRO when he used funds from his separate Wells Fargo account to gift $8,000 to religious organizations and prepay $5,000 for a mission trip.  The court rejected Wayne's argument that it was required to disregard these amounts spent because they were made from his VA disability benefits deposited into this account.  The court explained that Wayne could not establish that these amounts he spent were from his VA disability benefits rather than marital funds because he opened his separate bank account with $18,000 in marital funds and then commingled his disability

---

1.     Under SDCL 25-4-33.1, an automatic temporary restraining order is in effect upon personal service of the summons and complaint for divorce on the defendant.

benefits with those marital funds.  Therefore, the court added $13,000 to Wayne's share of the marital estate, representing amounts he expended from marital funds in violation of the TRO.

[¶20.]	The circuit court similarly determined that because Wayne commingled his lump sum disability payment and monthly disability benefits into the joint marital account prior to opening the separate account in February 2021, those benefits lost their exclusionary status.  The court therefore denied Wayne's request for a $37,000 credit for what he claimed he spent on the basement remodel and a $53,235 credit representing what he claimed were disability benefits used for principal mortgage payments.

[¶21.]	After making the above determinations and deeming the distribution of the parties' personal property to be "a wash[,]" the circuit court concluded that the value of the assets awarded to Wayne from the marital estate exceeded the value of the assets awarded to Regina by $440,000.  The court thus ordered Wayne to make a $220,000 cash equalization payment to Regina.  The court also awarded Regina a divorce for extreme cruelty, finding that Wayne inflicted grievous mental suffering upon Regina throughout the marriage.  The court did not award alimony, because neither party made such a request, and the court ordered that each party be responsible for their respective attorney fees and costs.

[¶22.]	Wayne appeals, asserting multiple issues that are restated as follows:

> 1.	Whether the circuit court erred in declaring the premarital agreement void.
>
> 2.	Whether the circuit court abused its discretion and committed clear error in its valuation and division of the marital estate.

3.      Whether the circuit court abused its discretion and committed clear error in its treatment of Wayne's disability benefits.

4.      Whether the circuit court erred in granting Regina a divorce on grounds of extreme cruelty.

## Analysis and Decision

### *1.* *Whether the circuit court erred in declaring the premarital agreement void.*

[¶23.]      On appeal, Wayne challenges both the circuit court's finding that Regina did not voluntarily execute the Agreement and the determination that the Agreement was unconscionable. Because we conclude that Wayne has not shown the court erred in its unconscionability determination, we address only that ruling.

[¶24.]      Under SDCL 25-2-21(a), "[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

> . . .
>
> (2) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:
>
>> (i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
>>
>> (ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
>>
>> (iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." *Id.* This Court reviews questions of law de novo; therefore, the circuit court's determination of unconscionability is given no

deference. *In re Eichstadt,* 2022 S.D. 78, ¶ 19, 983 N.W.2d 572, 580 (quoting

*Smetana v. Smetana,* 2007 S.D. 5, ¶ 7, 726 N.W.2d 887, 891). However, the court's

findings of fact are reviewed under the clearly erroneous standard of review. *In re*

*Estate of Smid,* 2008 S.D. 82, ¶ 27, 756 N.W.2d 1, 10 (reviewing the court's findings

related to its unconscionability determination for clear error).

[¶25.] Here, the circuit court determined that the Agreement was

unconscionable at the time it was executed because it "did not make any provisions

for [Regina's] retirement" and Regina's retirement plan "was not adequate to

provide for her retirement." The court further determined that Regina "did not get

a fair and reasonable disclosure of the property or financial condition of [Wayne]";

"did not voluntarily expressly waive in writing any right to the disclosure of said

property, or financial obligations"; and "did not or reasonably could [sic] have had

adequate knowledge of the nature and extent of [Wayne's] property or financial

obligations" via the "disclosure by [Wayne] or through independent knowledge."

[¶26.] On appeal, Wayne does not assert that the Agreement provided for

Regina or that the circuit court erred in concluding otherwise.[2] He also does not

argue that the court clearly erred in its finding under SDCL 25-2-21(a)(2)(ii) that

Regina did not voluntarily and expressly waive in writing the right to *disclosure* of

---

2.    In *Eichstadt,* this Court explained that when considering whether the
      agreement was unconscionable when it was executed, "the circuit court could
      consider, as part of its examination of the circumstances surrounding the
      execution of the Agreement, the actual terms of the Agreement, including
      that it made no provision for [the other spouse] regardless of how many years
      the couple would be married." 2022 S.D. 78, ¶ 42, 983 N.W.2d at 588.

his property. Rather, Wayne's appellate arguments seem directed at the adequacy of the circuit court's findings under SDCL 25-2-21(a)(2)(i) and (iii).

[¶27.] As it pertains to these two subsections, Wayne contends the circuit court erred in finding the agreement unconscionable because, in his view, "Regina had reasonable disclosure of what the assets were" and "adequate knowledge of [his] property." As support, Wayne directs us to certain emails entered into evidence at trial, which he claims establish that his 401k balance was disclosed to Regina during a meeting they had with a financial planner.

[¶28.] While Regina mentioned the parties' retirement accounts in a June 7 email to Wayne, this email does not refer to Regina and Wayne meeting with a financial planner, nor does the email show that Regina knew the balance of Wayne's 401k. Rather, the email refers to a conversation she had with her coworker regarding "the 401K thing" and her belief that Wayne was "okay with the 401K ROTH[.]" The email ends with a statement from Regina that she would bring home information for *him* to let her know what would be best to "do for both our employer plans." Further, although Wayne contends Regina had an adequate knowledge of his property, he has not established clear error in the circuit court's finding that while Regina knew he had a 401k, she did not know the extent and nature of its value. Wayne also has not directed this Court to any evidence that Regina was aware of his HSA or bank account balances, which were similarly not disclosed by Wayne prior to Regina executing the Agreement.[3] As the Court in *Sanford v.*

---

3. Wayne testified that "[t]here was no need" to list his bank account balance on his property schedule because he could "literally go back to that day and pull

(continued . . .)

*Sanford* noted, "[i]t does not fall upon a spouse to assume the role of detective in an attempt to ferret out the existence and value of the other spouse's assets." 2005 S.D. 34, ¶ 42, 694 N.W.2d 283, 294.

[¶29.] Wayne further argues that "the beginning number [of his retirement account] was immaterial" because "[b]oth parties elected to waive any future claim to not only the premarital values of their 401k accounts but any growth that occurred on the account." In his view, it would be "unjust" to invalidate the Agreement because "Regina sold [him] on not wanting his money and had him draft a prenuptial agreement to prove that she did not want it."[4]

[¶30.] Aside from the fact that Wayne's argument in this regard focuses only on his retirement account and not his other undisclosed assets, Wayne cites no authority to support his claim that he did not need to *disclose* his retirement account as an asset simply because the parties intended the Agreement to *waive* a future *claim* to each other's retirement accounts. On the contrary, Wayne had the burden of disclosing all of his assets in a manner that was precise enough to give Regina "a reasonable approximation of the magnitude of [his] net worth." *See id.* ¶¶

---

(. . . continued)
up a Wells Fargo statement that shows the day before marriage what it was in the account." He further testified that he did not list his HSA balance because he "didn't know HSA's were divisible[.]"

4.   Although Wayne also argues that invalidating the agreement would "reward Regina for her fraudulent inducement to convince [him] to enter the agreement and marry her," he did not assert a claim for fraudulent inducement below. Therefore, we decline to address it on appeal. "We have repeatedly stated that we will not address for the first time on appeal issues not raised below." *Hiller v. Hiller*, 2015 S.D. 58, ¶ 23, 866 N.W.2d 536, 544 (citation omitted).

#30321

42–44, 694 N.W.2d at 294–95. Because Wayne has not established clear error in the circuit court's findings under SDCL 25-2-21(a)(2), we affirm the circuit court's decision voiding the Agreement as unconscionable.

### 2. Whether the circuit court abused its discretion and committed clear error in its valuation and division of the marital estate.

[¶31.] Wayne advances multiple arguments related to the circuit court's valuation and equitable division of the marital estate in the event this Court affirms the circuit court's determination invalidating the Agreement. He contends the court erred in including the parties' respective retirement accounts in the marital estate when their testimony indicated an intent to exclude those accounts from consideration.[5] He further contends that the court erred in failing to give him full credit for $87,000 he received in premarital proceeds from the sale of his home.[6] In regard to their marital home, Wayne asserts the court erred in denying him a

---

5. He also argues at multiple points in his appellate brief that the circuit court abused its discretion and clearly erred in not giving the parties "full credit" for "the values of their respective premarital assets," including "the cash and bank accounts that existed at the time of marriage." In his view, he should have received a $213,424 credit and Regina should have received a $15,000 credit. However, it is well settled that "[a] court is not required to 'give both divorcing parties credit for all their premarital assets in order to make an equitable division of property.'" *Muenster v. Muenster*, 2009 S.D. 23, ¶ 16, 764 N.W.2d 712, 717 (citation omitted).

6. Wayne advances other arguments for the first time on appeal, or for the first time in his reply brief. It is well settled that "[a] party may not raise an issue for the first time on appeal, especially in a reply brief when the other party does not have the opportunity to answer." *Ellingson v. Ammann*, 2013 S.D. 32, ¶ 10, 830 N.W.2d 99, 102 (citation omitted). Therefore, we decline to address whether the circuit court failed to apply a $500 credit for a motorcycle he sold prior to their marriage and whether the court erred in valuing the marital home at the time of the divorce.

$100,000 credit for the labor he provided during the basement remodel that increased the value of the marital home; a $29,976 credit to offset the future sale costs for the home; and a $10,686 credit for property taxes due for the tax period when Regina was still living in the home. Additionally, he argues the court erred when determining he violated the TRO by spending $15,900 from his HSA for eye surgery. Finally, he contends the court abused its discretion in dividing the marital estate equally because, in his view, Regina contributed only 1.1% to the accumulation of marital assets.

[¶32.]     As recently stated,

> This Court reviews the circuit court's division of marital property for an abuse of discretion. *Osdoba v. Kelley-Osdoba*, 2018 S.D. 43, ¶ 10, 913 N.W.2d 496, 500. The court's classification of property as marital or non-marital is also reviewed for an abuse of discretion. *Green v. Green*, 2019 S.D. 5, ¶ 21, 922 N.W.2d 283, 290. "An abuse of discretion occurs when discretion is exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Id.* ¶ 11, 922 N.W.2d at 288 (citation omitted).

*Cook v. Cook*, 2022 S.D. 74, ¶ 19, 983 N.W.2d 180, 188. However, we review a circuit court's valuation of the particular assets under the clearly erroneous standard of review. *Dunham v. Sabers*, 2022 S.D. 65, ¶ 63, 981 N.W.2d 620, 642. Notably, "[t]he trial court's findings of fact are presumptively correct and the burden is upon appellant to show error." *Id.*

### A.    *Inclusion of the retirement accounts in the marital estate*

[¶33.]    Wayne argues that the court erred in not excluding the parties' respective retirement accounts from the marital estate because, in his view, there existed an "express contract that should be enforced." More specifically, he cites the law governing express contracts, including SDCL 53-1-3, and argues that the court erred as a matter of law in including the parties' 401k and retirement accounts in the marital estate in light of Regina's testimony at trial that she told Wayne she did not want any part of his retirement account and would not make a claim for his retirement account if they were to get divorced, and his agreement to the same.

[¶34.]    Wayne did not assert to the circuit court that under SDCL 53-1-3 the parties entered into an express contract (other than the written premarital agreement) regarding their retirement accounts. Rather, he argued more generally that the court should, regardless of the validity of the Agreement, exclude the parties' respective premarital assets, including the retirement accounts, based on the parties' testimony that they had agreed not to go after each other's retirement accounts. Because the existence of an express contract under SDCL 53-1-3 was not raised to the circuit court, Wayne cannot assert that claim for the first time on appeal. *See Hiller v. Hiller*, 2015 S.D. 58, ¶ 23, 866 N.W.2d 536, 544 (noting our general rule "that we will not address for the first time on appeal issues not raised below" (citation omitted)). We note, however, that the circuit court did consider, as related below, which assets to exclude as premarital when ultimately dividing the parties' property.

### B.    Proceeds from sale of Wayne's premarital home

[¶35.]    Wayne presented evidence that he received approximately $87,000 in proceeds from the sale of the home he owned personally.  He testified that he deposited the entire amount in his personal Wells Fargo account in February 2018, which became the couple's joint account in May 2018.  The court gave Wayne a $60,000 credit, noting that the parties had agreed that such amount reflected what Wayne personally contributed to the down payment on their marital home.  Wayne does not dispute that the remaining $27,000 was eventually commingled with marital funds in an account that was indiscriminately used for marital expenses.  He thus has not shown the court clearly erred in treating this commingled amount as shared property.

### C.    Credits related to the valuation of the marital home

[¶36.]    Wayne argues the circuit court erred in failing to give him a $100,000 credit for his contribution as the general contractor on the basement remodel project.  He notes that this Court has recognized that a spouse's performance of domestic duties constitutes a valuable contribution to the marital estate.  *See, e.g., Endres v. Endres*, 532 N.W.2d 65, 71 (S.D. 1995).  He then argues that the same should be true for his contribution as a general contractor on the remodel project, which he claims increased the value of the marital home by approximately $100,000.  Although Wayne's argument attempts to parse out and place a dollar amount on his contribution to the value of this asset, he has not shown the court erred in finding that both parties through their joint, though not identical, efforts

contributed to the maintenance and improvement of the marital home. In particular, the court found that both parties worked full-time and contributed their earnings to the marriage, and both worked within the home to clean, maintain, and improve it. The record supports these findings and the court's corresponding denial of a $100,000 credit.

[¶37.]        In regard to the value of the marital home, Wayne further argues that the circuit court failed to address his request for a $10,686 credit reflecting property taxes on the marital residence incurred during the parties' marriage but payable after divorce. In his view, "[t]he taxes need to be included as a line item in the marital estate" as a debt to Wayne and thus a credit to the value of the marital home.

[¶38.]        It is unclear from a review of the record whether Wayne requested the circuit court award him a $10,686 credit for *property taxes* incurred during the marriage. During the trial, the parties referred to multiple joint property exhibits, but there is only one in the record for this Court to review. On that exhibit, the property taxes are not identified, which Wayne acknowledged during his direct testimony. However, he also answered "Yes" in response to a question about whether he is asking the court to "allocate" $10,000 in "costs and fees that [the appraiser] talked about with the sales tax, recording fees, and the back taxes" that Wayne will "have to pay as the one who takes that house." Wayne then testified that "[t]he taxes alone are 6000 a year[,]" referring to taxes on the house. But during closing argument, his attorney requested $5,343 for "the back sales taxes"; he did not request $10,000 or any other amount for property taxes incurred during

the marriage. Finally, Wayne's proposed findings and conclusions do not propose that he receive a credit for $10,000 or any other amount for *property* taxes incurred during the marriage. Rather, he proposed that he be "given credit for the *sales* tax and closing costs" that he contends would be incurred upon a sale of the marital home, in the amount of $5,343. (Emphasis added.) Because it is not clear from this record that Wayne specifically argued to the circuit court that he should receive a $10,686 credit against the value of the marital home for property taxes incurred during the marriage, Wayne has failed to establish error as it relates to a credit for such taxes.

[¶39.]    Wayne also argues that the circuit court erred in denying him credit for $29,976 in anticipated realtor and closing costs related to the sale of his home. He does not challenge the court's finding that he did not express any intent to sell the home. However, he relies on this Court's prior determination that "even if sale of the home [was] not immediately contemplated, it [is] reasonable for the [circuit] court to consider the net value of the house to the party who received it." *Osdoba v. Kelley-Osdoba*, 2018 S.D. 43, ¶ 14, 913 N.W.2d 496, 501 (alterations in original) (quoting *Abrams v. Abrams*, 516 N.W.2d 348, 351 (S.D. 1994)). But we did not hold in *Osdoba* that a circuit court *must* take into account the cost of selling a home when valuing it for purposes of a property division. Moreover, while the Court in *Osdoba* referred to decisions from other courts regarding the notion that a court *may* consider the net value, one of those decisions, *Zeigler v. Zeigler*, declined to adopt a per se rule that the costs of sale *must* be deducted. *See* 530 A.2d 445, 550 (Pa. Sup. Ct. 1987). As the court in *Zeigler* explained, an intention to sell "is not

easily susceptible of proof." *Id.* Further, "the proper amount to deduct for costs of sale would be a matter of speculation" because "[a]lthough it is common practice to employ the services of a realtor in selling a home, it is not uncommon for an owner to undertake a sale without the assistance of a realtor." *Id.* Finally, there is not a standard, universal commission, and "although realty transfer taxes are routinely split equally between buyer and seller, the practice is not universal." *Id.*

[¶40.] Here, because of the lack of evidence of an intention to sell and the uncertainties of what costs would exist in the future if and when Wayne did sell, Wayne has not shown the circuit court erred in declining to give him credit for the potential costs associated with selling the home.

### D. Recapture of marital value of HSA amounts spent

[¶41.] Wayne argues that a different judge at a hearing in July 2022 gave him "authority to schedule his eye procedure" and indicated that if Wayne spent the money, it would not be a marital asset. He thus claims it was error for this circuit court judge to reverse course "[b]y clawing back the payment[.]"[7] In declining to accept wholesale Wayne's claim that a different judge at a prior hearing authorized the expenditure, the circuit court noted the absence of a transcript from that July 2022 hearing. The record on appeal likewise does not contain a transcript of that hearing. There is also no order in the record issued after the July 2022 hearing

---

7. Wayne characterizes the circuit court's ruling as similar to a transfer between spouses to a qualified domestic relations order (QDRO). He thus requests that if this Court upholds the "HSA claw back" then "the matter should be remanded to order the transfer of HSA funds to be performed via a QDRO." But the court did not order that Wayne access his HSA funds for the cash equalization payment or transfer HSA funds to Regina.

giving Wayne the authorization he claims he was given. As such, there is no way for this Court to review the propriety of Wayne's claim that he had permission to expend $15,000 while the TRO was in effect. Therefore, this Court's "presumption is that the circuit court acted properly." *Graff v. Children's Care Hosp. and Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489 (quoting *Baltodano v. N. Cent. Health Servs., Inc.*, 508 N.W.2d 892, 894–95 (S.D. 1993)).

### E. *Equal division of the marital estate*

[¶42.] Wayne argues that the circuit court abused its discretion in "making a 50/50 equalization" when, in his view, the evidence shows that his financial and non-financial contributions to the marriage far exceeded Regina's. More specifically, he asserts that during the parties' short marriage, he took care of all activities necessary to maintain the marital home and the parties' vehicles. He further claims he did all the grocery shopping, cooked most of the meals, and did most of the laundry and house cleaning. In regard to Regina's financial contributions, Wayne contends she "spent more than she contributed on personal items or gifts that did not benefit the marital estate." He further notes that Regina received $500 per month from him after the parties separated.

[¶43.] In making an equitable division of the marital estate, "the law does not require perfection that would approach mathematical certainty." *Osdoba*, 2018 S.D. 43, ¶ 18, 913 N.W.2d at 502 (citation omitted). Therefore, "there is no rigid formula that must be followed, nor any fixed percentage to which either party is entitled." *Id.* ¶ 19 (citation omitted). However, the circuit court should consider the following factors:

(1) the duration of the marriage; (2) the value of the property owned by the parties; (3) the ages of the parties; (4) the health of the parties; (5) the competency of the parties to earn a living; (6) the contribution of each party to the accumulation of the property; and (7) the income-producing capacity of the parties' assets.

*Id.* (citation omitted). "The trial court must make the division of property on the basis of these principal factors while having due regard for equity and the circumstances of the parties." *Huffaker v. Huffaker*, 2012 S.D. 81, ¶ 20, 823 N.W.2d 787, 792 (citation omitted).

[¶44.]     Here, while the marriage was short and there was a disparity in the parties' financial contributions during the marriage, the circuit court considered all the factors attendant to dividing the parties' property with due regard for equity and the parties' circumstances. In particular, the court noted that the parties' assets are not income producing and "that Wayne's capacity to earn an income is twice Regina's[.]" The court further considered that they both contributed their earnings to the marriage and both worked within the home to maintain and improve it. Notably, the court gave Wayne credit for, or otherwise did not include in the marital estate, the premarital value of his HSA and retirement account. The court also gave him credit for $60,000 from the sale of the premarital home that he contributed to the purchase of the marital home.

[¶45.]     Although Wayne disagrees with the circuit court's view of Regina's contributions during the marriage, Wayne does not address the court's finding that the parties intended the marriage to be a partnership, a finding that is supported by the record. As this Court repeatedly states, when dividing property in a divorce proceeding, the court is not required to follow a rigid formula and the parties are

#30321

not entitled to any fixed percentage. *Dunham*, 2022 S.D. 65, ¶ 40, 981 N.W.2d at

637. We therefore conclude Wayne has not established the circuit court abused its

discretion in equally dividing the marital estate.

### 3. Whether the circuit court abused its discretion and committed clear error in its treatment of Wayne's disability benefits.

[¶46.] Wayne argues that the circuit court "failed to recognize that the

veteran's disability payments [he] began receiving for his service-connected

disability were not military retirement pay and under federal law were not divisible

as a material asset." On the contrary, the court specifically noted that Wayne

received VA *disability* benefits; therefore, the court did not treat the benefits as

military retirement pay. Further, the court did not *fail* to recognize that VA

disability benefits are not divisible in a divorce. Rather, the court quoted the

governing federal regulation and this Court's holding in *Cook* that VA disability

benefits are excluded from division in a divorce. *See* 2022 S.D. 74, ¶ 23, 983 N.W.2d

at 188 (noting that federal law "prohibits state courts from treating military

disability benefits, received after the waiver of military retirement pay, as marital

property subject to division"). Therefore, the circumstances here are unlike those at

issue in *Cook*, wherein the circuit court concluded that the husband's VA disability

benefits were marital property subject to division. *See id.* ¶ 25, 983 N.W.2d at 189–

90.

[¶47.] However, Wayne argues that the circuit court nevertheless erred when

it failed to exclude from the marital estate the following amounts he claims were

expended using his VA disability benefits: (1) $37,000 of his initial lump sum

disability benefit used on the basement remodel project; (2) $53,200 from his monthly benefit amount used to make payments toward the principal on the parties' marital home; and (3) $13,000 from his personal Wells Fargo account opened in February 2021. He does not dispute that the first two amounts were spent from funds in the parties' joint Wells Fargo account. He also does not dispute that he opened his separate account from which he spent the $13,000, with $18,000 from the parties' joint account.[8] Rather, he claims that the court improperly treated these expenditures as marital property subject to division when, in his view, they can be traced to his VA disability benefits.

[¶48.]        Although Wayne argues that he can trace the $37,000, $53,235, and $13,000 payments to his disability benefits, he has not directed this Court to any evidence, such as banking records or other documentation, connecting those payments to his disability benefits. This is problematic because without evidence that these expenditures were from Wayne's disability benefits, it is unclear how this Court could conclude that the circuit court treated Wayne's VA disability benefits as marital property in violation of federal law. However, this Court has not before examined whether VA disability benefits lose their exclusionary status when they are commingled with marital assets or monies. We therefore address that question in determining whether the court erred here.

---

8.    Without any evidentiary support, Wayne argues that the $18,000 he took from the joint account represents "VA monies remaining" in that account. There is nothing in the record showing that Wayne segregated his VA benefits from other funds in the parties' joint account.

[¶49.] After recognizing that Wayne's VA disability benefits are not subject to division, the circuit court quoted cases from other courts for support of its determination that by inextricably commingling his VA benefits with marital money or marital assets, Wayne's VA benefits lost their exempt status. For example, in *Bischoff v. Bischoff*, the Kentucky court examined whether the trial court erred in concluding that the parties' residence was marital property when the defendant claimed that the payments on the residence were made solely from the defendant's disability benefits. 987 S.W.2d 798, 799 (Ky. Ct. App. 1998). The court noted that the defendant's "disability payment funds had been co-mingled with [his wife's] earnings and the proceeds of the tobacco enterprise to purchase the property[.]" *Id.* at 800. Therefore, the court concluded that "the exemption applicable to the disability payments does not extend to property purchased with those funds." *Id.* at 799. Similarly, the court in *Stacy v. Stacy* noted that disability payments that would otherwise be exempt when deposited in the veteran's own account "may lose their separate character when they are comingled with the marital assets." 144 N.E.3d 899, 905 (Mass. Ct. App. 2020).

[¶50.] Here, Wayne deposited his initial lump sum disability benefit payment and subsequent monthly payments, up to February 2021, in the parties' joint Wells Fargo account in which both parties were also depositing their paychecks. Thus, it is not possible to determine whether the funds used from that account to pay $37,000 on the basement remodel project and $53,235 toward the principal of the mortgage were from Wayne's VA disability benefits or the parties' marital funds. And although after February 2021, Wayne deposited his monthly VA disability

benefits into his personal account, that account was opened with $18,000 from the parties' joint account. Therefore, the $13,000 he spent from that account could have been the parties' marital funds rather than his VA disability benefits. Because the circuit court did not operate under the incorrect impression that Wayne's VA disability benefits are subject to division in a divorce and Wayne has not produced sufficient evidence to trace the $37,000, $53,235, and $13,000 expenditures to his VA disability benefits, Wayne has not established that the circuit court erroneously treated his VA disability benefits as divisible marital property.[9]

### 4. Whether the circuit court erred in granting Regina a divorce on grounds of extreme cruelty.

[¶51.] Wayne argues the circuit court erred when it overruled his objection to the court's consideration of the 2016 incident when granting Regina a divorce based on extreme cruelty. He claims that this premarital incident cannot provide the grounds for termination of the marriage. However, the court did not rely solely on their premarital conduct in granting Regina a divorce on the ground of extreme cruelty. Moreover, although the 2016 incident occurred prior to the parties' marriage, the conduct was relevant to the court's consideration of the personalities of the parties involved. As this Court stated, [i]n a marital setting, the definition of extreme cruelty differs according to the personalities of the parties involved." *Evens*

---

9. However, the circuit court erred in its finding that: "All subsequent deposits of his VA disability benefits deposited in Wells Fargo account 4934 up to the date of dissolution then also became marital assets." Although such a determination is too broad, Wayne has not established prejudice because the circuit court only considered $13,000 spent from his personal account, which is less than the $18,000 in marital funds Wayne deposited into that account before spending the $13,000.

*v. Evens*, 2020 S.D. 62, ¶ 22, 951 N.W.2d 268, 277 (quoting *Scherer v. Scherer*, 2015 S.D. 32, ¶ 15, 864 N.W.2d 490, 496).

[¶52.]        However, Wayne further argues that the evidence does not establish extreme cruelty because Regina initiated contact with him after the 2016 incident to rekindle their romance.  He also claims that during their marriage, he took care of the household, paid all the bills, cooked all the meals, and was a very loving and caring person to Regina.  He directs this Court to her social media posts detailing the special way he treated her.

[¶53.]        SDCL 25-4-4 defines "[e]xtreme cruelty" as "the infliction of grievous bodily injury or grievous mental suffering upon the other, by one party to the marriage."  "The evidence must be viewed 'in the light of the full context of the relationship between the parties and not in the narrow light of isolated incidents[.]'" *Brandsma v. Brandsma*, 318 N.W.2d 318, 318 (S.D. 1982) (citation omitted).  *See also Evens*, 2020 S.D. 62, ¶ 22, 951 N.W.2d at 277.

[¶54.]        Here, the circuit court found that Wayne's evidence of Regina's social media posts praising Wayne and professing her love for him did not discredit Regina's claims that he was emotionally abusive toward her.  Rather, the court found credible Regina's testimony that she made the posts in an attempt to pacify his demands for praise.  The court also accepted as credible Regina's testimony that Wayne would call her names and that Wayne used her past experiences of abuse to injure her emotionally.  Finally, the court relied on Regina's audio exhibit depicting Wayne berating her during the marriage for not having sex with him.  To the court,

Wayne's verbal abuse of Regina as depicted in this video is "abhorrent" and "appalling."

[¶55.]  Wayne discounts the video evidence, claiming that the recording does not provide an accurate picture.  He further asserts the circuit court ignored testimony that called into doubt Regina's credibility.  However, Wayne's arguments in this regard ignore that "[t]he credibility of the witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the circuit court and we give due regard to the circuit court's opportunity to observe the witnesses and the evidence." *Hiller v. Hiller*, 2018 S.D. 74, ¶ 22, 919 N.W.2d 548, 555 (citation omitted).  Wayne has not shown that the circuit court's finding of extreme cruelty is clearly erroneous.

### *Appellate Attorney Fees*

[¶56.]  Regina has submitted a request for an award of $8,796.02 in appellate attorney fees pursuant to SDCL 15-26A-87.3 and SDCL 15-17-38.  Such fees are authorized in divorce cases in the circuit court and likewise on appeal.  As the prevailing party, we award Regina $4,398 in appellate attorney fees.

[¶57.]  Affirmed.

[¶58.]  JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.